FIRST DIVISION
December 20, 2010

No. 1-07-0207

JONATHON IACCINO, a Minor, by His      )      Appeal from the
Parents and Next Friends, JOHN IACCINO )      Circuit Court of
and ELISA IACCINO, and JOHN IACCINO    )      Cook County, Law
and ELISA IACCINO, Individually,       )      Division.
                                       )
          Plaintiffs-Appellants,       )
                                       )
     v.                                )      No. 00 L 42329
                                       )
LORI L. ANDERSON, LINDA                )
R. GIBSON, and WOMANCARE, P.C.,        )
a Corporation,                         )      Honorable
                                       )      Daniel M. Locallo,
          Defendants-Appellees.        )      Judge Presiding.


     PRESIDING JUSTICE HALL delivered the opinion of the court:

     This case concerns an action for medical malpractice brought

by plaintiffs John Iaccino and Elisa Iaccino, individually and as

parents and next friends of the minor plaintiff, Jonathon

Iaccino, against defendants Dr. Lori L. Anderson, Dr. Linda R.

Gibson, Womancare, P.C. (Womancare), and Northwest Community

Hospital[1] for injuries Jonathon sustained during labor as a

result of oxygen deprivation (hypoxia).

     Plaintiffs maintained that Dr. Anderson negligently

administered the drug Pitocin to Mrs. Iaccino during labor,

causing hyperstimulation of her uterus (tachysystole) resulting

---

     [1] The hospital settled prior to the first trial and is not

a party to this appeal.  The first trial ended in a mistrial.

No. 1-07-0207

in Jonathon being deprived of oxygen.[2]  Plaintiffs contend Dr. Anderson deviated from the applicable standard of care by negligently monitoring Jonathon's fetal heart rate,[3] and as a

_____

    [2] Pitocin is a synthetic version of the hormone oxytocin, which is used to induce labor by stimulating uterine contractions. See Northern Trust Co. v. Burandt & Armbrust, LLP, 403 Ill. App. 3d 260, 264, 933 N.E.2d 432 (2010); see also Velazquez v. Portadin, 163 N.J. 677, 681, 751 A.2d 102, 105 (2000) ("Pitocin is a medication used to increase the intensity and frequency of uterine contractions in women whose contractions are insufficient to deliver the baby.  If Pitocin causes the contractions to occur too frequently or last too long, the baby may be harmed because blood flow to the baby slows during contractions.  That condition is called hyperstimulation of the uterus.  When the uterus is hyperstimulated, the interval between contractions is shortened and there is not enough time for the baby to catch up on its oxygen needs before the start of another contraction").

    At trial, hyperstimulation of the uterus was defined as "a persistent pattern of more than five contractions in ten minutes, contractions lasting more than two minutes, or contractions of normal duration occurring within one minute of each other."

    [3] Expert testimony established that during labor one of the ways babies compensate for a lack of oxygen is to speed up their heart rates.

result, failed to timely discontinue the use of Pitocin, resulting in Jonathon's brain being deprived of oxygen during labor and delivery.

Plaintiffs further claim that Dr. Anderson was negligent in failing to recognize uterine hyperstimulation, failing to recognize evidence of fetal intolerance to labor as allegedly reflected on the external electronic fetal monitor (EFM)[4] strip, failing to recognize cephalopelvic disproportion (CPD),[5] failing to recognize arrest of descent into the birth canal, and failing to recommend a cesarean section.

----

[4] An electronic fetal monitor is a machine that produces a printout or fetal monitoring strip to "continually assess the fetal heart rate and the relationship of the fetal heart rate to maternal contractions, and are continually analyzed to determine whether there is fetal distress or stress upon the fetus caused by a lack of oxygen to the fetus." Baglio v. St. John's Queens Hospital, 303 A.D.2d 341, 342, 755 N.Y.S.2d 427, 428 (2003). An external fetal monitor is essentially an ultrasound transmitter affixed to the woman's abdomen that monitors the baby's heart rate.

[5] "Cephalopelvic disproportion," or CPD, is a " 'condition in which the head of the fetus is abnormally large in relation to the size of the mother's pelvis.' " Mendez v. United States, 732 F. Supp. 414, 426 n.15 (S.D.N.Y. 1990), quoting 1 J. Schmidt, Attorney's Dictionary of Medicine and Word Finder C-99 (1986).

Plaintiffs contend Dr. Gibson was negligent in failing to identify and respond to fetal intolerance to labor; failing to maintain good quality electronic fetal monitoring; performing an inadequate initial examination at 7:56 a.m.; improperly disconnecting the internal fetal electrode while waiting for the arrival of a surgical assistant to assist in performing the cesarean section; and failing to perform a timely cesarean section.

Defendants' theory of the case was that the proximate cause of Jonathon's injury was an infection in the placenta that traveled to the fetal brain, causing brain damage before any alleged malpractice by defendants. The jury returned a general verdict in favor of defendants and against plaintiffs. Plaintiffs now appeal and seek a new trial.

For the reasons that follow, we affirm. Additional facts are set forth as each issue is addressed.

ANALYSIS

Plaintiffs contend the trial court erred by allowing defendants to cross-examine and impeach plaintiffs' expert witness, Dr. Gary Blake, with a written medical report the doctor prepared as part of plaintiffs' compliance with the pleading requirements of section 2-622(a)(1) of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-622(a)(1) (West 2004)). Although this was the third issue raised in plaintiffs' appellate brief, we address it first because it involves a matter of first

No. 1-07-0207

impression before this court.

In 1985, the Illinois legislature enacted section 2-622 of the Code in an effort to curtail frivolous medical malpractice lawsuits and to eliminate such actions at the pleading stage before the expenses of litigation mounted. DeLuna v. St. Elizabeth's Hospital, 147 Ill. 2d 57, 65, 588 N.E.2d 1139 (1992); B. Elward, The 1985 Illinois Medical Malpractice Reform Act: An Overview and Analysis, 14 S. Ill. U. L.J. 27, 28 (1989).

Section 2-622(a)(1) requires the plaintiff (if proceeding pro se) or his attorney to file an affidavit of merit with the complaint stating that the affiant has consulted and reviewed the facts of the case with a health care professional who, in a written medical report -- after a review of the medical records and other relevant material -- has determined that there is a "reasonable and meritorious" cause for filing the action. 735 ILCS 5/2-622(a)(1) (West 2004). A copy of the medical report must be attached to the affidavit and the report must clearly identify the "plaintiff and the reasons for the reviewing health professional's determination that a reasonable and meritorious cause for the filing of the action exists." 735 ILCS 5/2-622(a)(1) (West 2004); Moyer v. Southern Illinois Hospital Service Corp., 327 Ill. App. 3d 889, 902, 764 N.E.2d 155 (2002).

In the instant case, the trial court permitted defense counsel to impeach Dr. Blake with alleged inconsistencies between some of the opinions contained in the doctor's written medical

report and his trial testimony.  The question on review is, assuming a proper foundation had been laid, whether the trial court erred in allowing the doctor's written medical report to be used as a prior inconsistent statement for impeachment purposes.

In a medical malpractice action, the plaintiff must establish the standards of care against which the physician's conduct is measured by the use of expert testimony. Kotvan v. Kirk, 321 Ill. App. 3d 733, 741, 747 N.E.2d 1045 (2001).  The value of expert testimony depends upon the facts and reasons which form the basis of the expert's opinion. In re Custody of Brunken, 139 Ill. App. 3d 232, 239-40, 487 N.E.2d 397 (1985).

"The general rule is that an expert's testimony is to be judged by the rules of weight and credibility applied to all other witnesses." Hegener v. Board of Education, 208 Ill. App. 3d 701, 734, 567 N.E.2d 566 (1991).  An appropriate method of testing the credibility of a witness is to show that on a prior occasion the witness made statements inconsistent with his or her trial testimony. Sommese v. Mailing Brothers, Inc., 36 Ill. 2d 263, 268-69, 222 N.E.2d 468 (1966).

In order to be used for impeachment, a witness's prior statement must be materially inconsistent with his trial testimony. Thompson v. Abbott Laboratories, 193 Ill. App. 3d 188, 205, 549 N.E.2d 1295 (1990).  Moreover, before a statement may be admitted as a prior inconsistent statement, a proper foundation must be laid. Central Steel & Wire Co. v. Coating Research Corp.,

No. 1-07-0207

53 Ill. App. 3d 943, 946, 369 N.E.2d 140 (1977).

The foundation is laid by directing the witness's attention to the time, place and circumstances of the statement and its substance, or in the case of a written instrument, by identifying the signature. Boyce v. Risch, 276 Ill. App. 3d 274, 278, 657 N.E.2d 1145 (1995); Vancil v. Fletcher, 90 Ill. App. 2d 277, 283, 232 N.E.2d 789 (1967). The purpose of the foundation is to alert the witness to the prior inconsistent statement in order to avoid unfair surprise and to provide the witness with an opportunity to deny, correct, or explain the statement. Boyce, 276 Ill. App. 3d at 278. A trial court's decision to permit a prior statement to be used for impeachment purposes will not be disturbed absent a clear abuse of discretion. Van Steemburg v. General Aviation, Inc., 243 Ill. App. 3d 299, 329, 611 N.E.2d 1144 (1993).

In this case, the trial court properly ruled in allowing defense counsel to cross-examine and impeach Dr. Blake using excerpts from his written medical report. In his written medical report, Dr. Blake interpreted the decelerations that he saw on the fetal monitor strip as "variable decelerations." At trial, Dr. Blake changed his opinion and testified on direct examination that he interpreted the decelerations as either "late decelerations," or "variable decelerations with a late component."

A proper foundation was laid for impeachment using Dr. Blake's written medical report as a prior inconsistent statement

during cross-examination when the doctor changed his opinion once more and testified that he interpreted the decelerations simply as "late decelerations."  Defense counsel impeached Dr. Blake with the inconsistencies in the doctor's written medical report and his trial testimony as it related to the doctor's interpretation of the fetal heart decelerations on the fetal monitor strip.

Plaintiffs argue that allowing an expert to be impeached with his written medical report would unfairly handicap the expert because the report is only a threshold opinion usually prepared at a point before all of the facts are fully developed in discovery.  We must disagree.

Section 2-622 does not prescribe the form that a written medical report must take and there is nothing in the statute that prevents the author of such a report from qualifying his opinions to make clear that they are preliminary opinions subject to amendment or supplementation upon the acquisition of additional information such as additional medical records or deposition testimony.  Therefore, allowing an expert doctor to be impeached with his written medical report would not be unfair since the doctor could explain that his report was prepared during the early stages of discovery or he could attempt to explain any inconsistencies between his report and his trial testimony. See Cohen v. Dauphinee, 739 So. 2d 68, 77 (Fla. 1999) (Anstead, J., dissenting) (interpreting similar statute); see also Barnett v.

No. 1-07-0207

<u>Hidalgo</u>, 478 Mich. 151, 164, 732 N.W.2d 472, 480 (2007).

It would then be up to the jury to assess those explanations in evaluating the credibility of the doctor's testimony. In some cases, the jury may conclude that the doctor sufficiently explained why his opinion had changed. In other cases, the jury may conclude that a particular explanation was not credible. But these are evaluations the jury should be entitled to make based on all of the relevant and competent evidence. <u>Cohen</u>, 739 So. 2d at 77 (Anstead, J., dissenting).

Allowing an expert to be cross-examined and impeached with his written medical report serves to further the underlying purpose of section 2-622 in screening out frivolous and nonmeritorious medical malpractice lawsuits. The expert's verified written medical report is the document that permits medical malpractice litigation to be initiated in the first place. Section 2-622(g) of the Code provides that a plaintiff's failure to comply with the pleading requirements of section 2-622(a)(1) shall be grounds for dismissal under section 2-619. 735 ILCS 5/2-622(g) (West 2004).

If the expert, in sworn testimony in the ensuing litigation, testifies to something inconsistent with the opinions set forth in his written medical report, then there may be legitimate concern as to whether there was valid cause to initiate the litigation in the first instance. See <u>Cohen</u>, 739 So. 2d at 76 (Anstead, J., dissenting). In addition, if a physician writing

-9-

such a report knows that he or she may be subject to cross-examination concerning the opinions contained in the report, then the physician will be more careful to make only those accusations of medical malpractice that have a reasonably valid scientific basis.

" 'The principal safeguard against errant expert testimony is cross-examination.' " Leonardi v. Loyola University of Chicago, 168 Ill. 2d 83, 104, 658 N.E.2d 450 (1995), quoting Sears v. Rutishauser, 102 Ill. 2d 402, 407, 466 N.E.2d 210 (1984). And as Justice Anstead asked in delineating the public policy underlying a statute similar to our section 2-622(a)(1) of the Code, "what better way do courts have to ensure compliance with this policy than by making it known that an expert's opinion will not go unchecked or unchallenged at trial?" Cohen, 739 So. 2d at 76 (Anstead, J., dissenting).

The legislative policy underlying section 2-622 of the Code favors the disclosure and evaluation of any material changes in the trial testimony and opinions of an expert who provides a written medical report pursuant to section 2-622 of the Code. If an expert doctor's trial testimony is inconsistent with the opinions contained in his written medical report, then it is legitimate to raise that inconsistency before the jury. Cohen, 739 So. 2d at 77 (Anstead, J., dissenting).

In sum, we hold that an expert doctor's written medical report prepared pursuant to section 2-622 of the Code may be used

against him as a prior inconsistent statement for impeachment purposes.

Plaintiffs next contend the trial court erred by allowing defense expert Dr. Franciosi to render causation opinions at trial. Plaintiffs maintain the trial court erred in ruling that the opinions were admissible because they had not been disclosed during the doctor's discovery deposition or in his Rule 213(f) (210 Ill. 2d R. 213(f)) interrogatory answers. We disagree.

Under Rule 213(f)(3), upon written interrogatory, each party must disclose the subject matter, conclusions, opinions, qualifications and reports of a witness who will offer opinion testimony. Gee v. Treece, 365 Ill. App. 3d 1029, 1035, 851 N.E.2d 605 (2006). The purpose of the rule is to avoid surprise and permit litigants to ascertain and rely upon the opinions of experts retained by their adversaries. Brax v. Kennedy, 363 Ill. App. 3d 343, 354, 841 N.E.2d 137 (2005).

Whether an opinion has been adequately disclosed under Rule 213 is a matter within the trial court's discretion. Lawler v. MacDuff, 335 Ill. App. 3d 144, 147, 779 N.E.2d 311 (2002). A trial court's ruling concerning admission of evidence pursuant to Rule 213 will not be reversed absent an abuse of discretion. Department of Transportation v. Crull, 294 Ill. App. 3d 531, 537, 690 N.E.2d 143 (1998).

Dr. Franciosi is a pediatric pathologist. He was originally retained by Northwest Community Hospital to review a pathology

report of the mother's placenta as well as pathology slides of her placenta.  After Dr. Franciosi completed his review, the hospital submitted his opinions in its Rule 213 disclosure, which included the following description of the doctor's anticipated testimony:

> "Dr. Franciosi will testify that, based on his review of the *** slides, he sees evidence of inflammation involving the placental membrane and disk.  This inflammation is evidence of a maternal reaction to bacteria which was present in the amniotic fluid prior to Jonathon's delivery and which caused inflammation 24 to 36 hours before Jonathon's delivery.  The bacterial organism which caused the infection likely migrated from Mrs. Iaccino's vagina and, ultimately, entered the amniotic sac.  Once the organism entered the amniotic sac, Mrs. Iaccino's body would have reacted by producing polymorphonuclear leukocytes.  In the process of destroying the invading bacteria, such PMN's produce enzymes, or cytokines, which are known to cause placental vasospasm.  Such placental vasospasm is known to cause interference with the process of the placenta providing oxygenated blood to the fetus.  Dr. Franciosi is expected to describe this process in greater detail at his deposition and at trial.

> Additionally, Dr. Franciosi will testify that, based on his review of the above-mentioned records and pathology

slides, there is evidence of an intervillus thrombus within the maternal intervillus space. Dr. Franciosi will testify that the intervillus thrombus was likely present 48 hours prior to Jonathon's delivery and that such intervillus thrombi are also known to cause interference with the transfer of oxygenated blood between mothers and fetuses.

Moreover, Dr. Franciosi will testify that there was a large infarction present in the placenta which was present at least 72 hours prior to Jonathon's delivery. Such infarctions are also known to interfere with the placenta's ability to supply oxygenated blood to a mother's fetus.

Also, Dr. Franciosi is expected to testify that there is fibrin deposition in the placenta which was present 5 or more days prior to Jonathon's delivery. Such fibrin deposition is also known to interfere with the placenta's function of transferring oxygenated blood to a mother's fetus.

Dr. Franciosi will explain all of these processes in greater detail at his deposition and at trial."

The hospital settled prior to the beginning of the first trial, which subsequently ended in a mistrial. Defendants adopted the hospital's disclosure of Dr. Franciosi's above anticipated testimony as well as his discovery deposition.

At the second trial, which is the subject of this appeal, defendants theorized that the effect of the cytokines along with

the other three pathologies Dr. Franciosi identified in the Rule 213 disclosure -- intervillus thrombus, infarction, and fibrin deposition -- all combined to interfere with the placenta's function of transferring oxygenated blood to Jonathon during labor, resulting in him being born with metabolic acidosis.

Plaintiffs filed a pretrial motion in limine seeking to bar Dr. Franciosi from opining that the three pathologies he identified in the Rule 213 disclosure combined to cause Jonathon's injury. Plaintiffs argued then, as they do now, that in his Rule 213 disclosure and discovery deposition, Dr. Franciosi never opined that Jonathon's brain injury was caused by pathologies in the placenta. Plaintiffs contend the doctor's statements and opinions contained in the Rule 213 disclosure and discovery deposition are irrelevant because they failed to establish a causal connection between the three pathologies in the placenta and Jonathon's injury.

We find that the trial court did not abuse its discretion in denying the motion in limine. In his discovery deposition, Dr. Franciosi established a causal connection between the three identified pathologies in the mother's placenta and Jonathon's injury.

The record reveals that during his discovery deposition, counsel for the hospital posed several hypothetical questions to Dr. Franciosi. The doctor gave responses from which it could be inferred that the three identified pathologies (or as counsel

referred to them, conditions), all combined to possibly cause the medical condition complained of (metabolic acidosis), as shown by the following colloquy:

"Q. I'm going to ask you a specific question, and I'd like to have you answer the question that I ask specifically. With regard to all of the conditions that you listed, might or could these conditions exist in combination in a maternal placenta wherein a child is delivered without medical problems?

A. In my opinion, no.

Q. Is it possible, Doctor, that it can occur, that these conditions could exist in a maternal placenta wherein a child is born without medical problems?

[Plaintiffs' former counsel]: Objection, asked and answered.

A. In my opinion, no.

Q. Okay. So if I understand you correctly, Doctor, it's your testimony to a reasonable degree of medical certainty that the conditions which you've set forth in your disclosure, Exhibit Number 2, can never exist in a maternal placenta wherein a child is born without medical problems?

A. My --

[Plaintiffs' former counsel]: In combination?

A. In combination, yeah. In my opinion, these in combination will not, you know, be in a, quote/unquote, normal pregnancy."

Dr. Franciosi's responses to the hypothetical questions posed by counsel, along with the doctor's Rule 213 disclosure, constituted a professional opinion within a reasonable degree of medical certainty from which the trier of fact could infer a causal connection between the three pathologies (intervillus thrombus, infarction, and fibrin deposition) and Jonathon being born with metabolic acidosis.

An expert witness's answers to hypothetical questions are an acceptable basis for his or her expert opinion. Simers v. Bickers, 260 Ill. App. 3d 406, 412, 632 N.E.2d 219 (1994); Granberry v. Carbondale Clinic, S.C., 285 Ill. App. 3d 54, 59-60, 672 N.E.2d 1296 (1996). Moreover, a physician may testify to what might or could have caused an injury. Geers v. Brichta, 248 Ill. App. 3d 398, 407, 618 N.E.2d 531 (1993). "It remains for the trier of fact to determine the facts and the inferences to be drawn therefrom." Geers, 248 Ill. App. 3d at 407.

Plaintiffs next contend that Dr. Franciosi lacked personal knowledge of the clinical facts necessary to give a competent opinion as to the cause of Jonathon's injury. Plaintiffs maintain that the doctor's lack of personal knowledge as to what occurred during the labor and as to the nature of Jonathon's injury rendered the doctor incompetent to give expert testimony as to the cause of the injury. Again, plaintiffs' contentions must be rejected.

An expert witness is permitted to state an opinion based on

facts not within his or her personal knowledge so long as those facts are of a type reasonably relied upon by experts in the particular field. J.L. Simmons Co. v. Firestone Tire & Rubber Co., 108 Ill. 2d 106, 117, 483 N.E.2d 273 (1985); Hatfield v. Sandoz-Wander, Inc., 124 Ill. App. 3d 780, 787, 464 N.E.2d 1105 (1984).

In the instant case, Dr. Franciosi based his testimony primarily on the placental slides. He also considered various medical records from Jonathon's admission to Northwest Community Hospital. There is no suggestion in the record that these sources of information are not the type reasonably relied upon by pediatric pathologists to support their medical opinions. Therefore, Dr. Franciosi was entitled to rely on the placental slides and medical records in rendering his causation opinions.

Plaintiffs next contend they suffered prejudice from the admission of Dr. Franciosi's causation opinions because they were unable to effectively rebut these undisclosed opinions at trial. Again, we must disagree.

As we previously determined, a review of the record shows that Dr. Franciosi's causation opinions were disclosed. The doctor's opinions as to the possible causes of Jonathon's injuries were expressed in his timely disclosed discovery deposition.

Moreover, the record shows that Dr. Franciosi's causation opinions were rebutted by plaintiffs' expert witness, Dr. Michael

Kaufman. Dr. Kaufman, a board-certified anatomic pathologist, opined to a reasonable degree of medical certainty that the three pathologies identified by Dr. Franciosi (intervillus thrombus, infarction, and fibrin deposition), were all consistent with a normal, aging placenta and were not predictive of infection or sepsis or diagnostic of a hypoxic environment to the fetus.

Plaintiffs next contend the trial court abused its discretion by permitting defendants to cross-examine and impeach plaintiffs' expert witnesses using medical literature without first establishing the requisite foundation as to the authoritativeness of that literature. We must reject this contention as well.

It is well settled that the admission of evidence and the scope of cross-examination of expert witnesses rests within the sound discretion of the trial court, whose rulings will not be disturbed absent an abuse of that discretion. See Stapleton v. Moore, 403 Ill. App. 3d 147, 156, 932 N.E.2d 487 (2010); Tsoukas v. Lapid, 315 Ill. App. 3d 372, 380, 733 N.E.2d 823 (2000).

An expert may be cross-examined with articles and treatises he does not recognize, provided some other expert has testified that the publications are authoritative. See Bowman v. University of Chicago Hospitals, 366 Ill. App. 3d 577, 587-88, 852 N.E.2d 383 (2006); Stapleton, 403 Ill. App. 3d at 157-58; see also Tsoukas, 315 Ill. App. 3d at 380 ("[i]t is not improper to allow questioning to discover what potentially relevant information

plaintiff's expert may have failed to consider in reaching an opinion").  In addition, an expert may be cross-examined with respect to material he has reviewed, but upon which he did not rely. Piano v. Davison, 157 Ill. App. 3d 649, 671-72, 510 N.E.2d 1066 (1987); Jager v. Libretti, 273 Ill. App. 3d 960, 962-63, 652 N.E.2d 1120 (1995).

In the instant case, plaintiffs took issue with three medical articles: (1) an article authored by Dr. Yvonne Wu, published in the Journal of the American Medical Association (JAMA) on September 20, 2000; (2) an article authored by Dr. Karin Nelson, published in JAMA on July 16, 1997; and (3) a monograph published by the American College of Obstetricians and Gynecologists (ACOG).

These articles had either been reviewed by plaintiffs' expert witnesses prior to their cross-examination or the articles were established to be authoritative by other expert witnesses prior to cross-examination.  Therefore, the trial court did not err in permitting defendants to cross-examine and impeach plaintiffs' expert witnesses using the medical literature in question.

Plaintiffs next contend the trial court erred by allowing defense expert Dr. Elias Chalhub to bolster his trial testimony and credibility by referring to undisclosed medical literature in violation of Supreme Court Rule 213.  Plaintiffs maintain that in his discovery deposition, Dr. Chalhub did not disclose any

medical literature as part of his opinion on causation and that, therefore, the doctor's references at trial to medical literature violated Supreme Court Rule 213.  Again, we must disagree.

At his discovery deposition, when Dr. Chalhub was asked if he was "relying on any specific literature" to support his opinions, the doctor responded, "No, I mean, I think the literature is fairly extensive concerning this case." Plaintiffs' counsel then asked Dr. Chalhub if he was "going to point to one particular article or set of articles as a specific basis" of his opinions.  The doctor responded, "No.  I mean, there are too many that are, you know, quite explicit about the issues in this case."

When plaintiffs' counsel asked Dr. Chalhub if his opinions were always "right" in relation to other experts, the doctor responded that it was not a question of "right" or "wrong," but rather that the "common denominator" was the medical literature that the experts relied upon.  Later in the deposition, counsel asked Dr. Chalhub if he could cite any "recognized pediatric neurology text that cites cytokines as a cause of brain damage." The doctor responded by naming several medical texts.

As noted earlier, the purpose of Rule 213 is to prevent one party from surprising his opponent with undisclosed testimony. See Brax, 363 Ill. App. 3d at 354.  In this case, Dr. Chalhub's general references at trial to medical literature did not violate Rule 213's disclosure requirements.  Given Dr. Chalhub's

-20-

discovery deposition, plaintiffs knew early on that the doctor believed that his causation opinions were supported by the latest medical literature.

At trial, Dr. Chalhub testified that his opinions were supported by the medical literature. He did not cite any particular publication or article and he did not point to any particular passage. The doctor only testified that his opinions were supported by the medical literature in general. In this regard, Dr. Chalhub's trial testimony concerning the medical literature was consistent with his deposition testimony.

Since we have determined that defendants' use of the medical literature in the cross-examination of plaintiffs' expert witnesses was not improper, then it follows that reference to this literature in defendants' closing argument was also not improper. See, e.g., Mielke v. Condell Memorial Hospital, 124 Ill. App. 3d 42, 45, 463 N.E.2d 216 (1984) (attorney uses exhibits to cross-examine expert witnesses and relies on the exhibits in her closing argument).

Finally, we reject plaintiffs' contentions that the trial court erred by refusing to admit the proffered testimony of nurse Adrienne Mikkelsen and nurse Pamela Hibbs. The admission of evidence is within the sound discretion of the trial court, whose rulings will not be reversed absent an abuse of that discretion. Gill v. Foster, 157 Ill. 2d 304, 312-13, 626 N.E.2d 190 (1993).

Plaintiffs maintain the trial court erred by refusing to

-21-

admit nurse Mikkelsen's proffered testimony that approximately an hour before Jonathon's delivery by cesarean section, she made three separate requests to defendant doctors to apply a fetal scalp electrode to monitor the fetal heart rate more accurately. A review of the record does not support this argument.

The record shows that nurse Mikkelsen's cross-examination was briefly interrupted during trial and a meeting was held in chambers to discuss the admission of the nurse's proffered testimony. Plaintiffs' counsel took the position that the trial court had not yet ruled on the matter in limine, but that the parties had agreed to exclude the testimony.

When the trial court determined that the parties may not have reached such an agreement, the court ruled that the testimony could be admitted for purposes of explanation but "not for purposes of addressing the decision making between a nurse and doctor." Plaintiffs' counsel did not object to the ruling.

Thereafter, for reasons not explained by the record, plaintiffs' counsel did not seek to introduce the testimony. A party cannot complain of an alleged error to which he consented. McMath v. Katholi, 191 Ill. 2d 251, 255, 730 N.E.2d 1 (2000).

Plaintiffs finally contend the trial court abused its discretion by barring nurse Hibbs from testifying as to what she believed the electronic fetal monitor strip indicated about Jonathon's condition. Nurse Hibbs's edited evidence deposition was used at trial in lieu of her testimony.

Nurse Hibbs testified at length as to the scientific terminology associated with interpreting fetal monitoring strips, defining such terms as baseline fetal heart rate, types of variability (short and long term), accelerations, types of decelerations (early, variable, and late), uteroplacenta insufficiency, fetal reserve, hyperstimulation, and nonreassuring fetal heart rate pattern.

Nurse Hibbs was also allowed to give testimony regarding her interpretation of various sections of the fetal monitoring strips. Nurse Hibbs testified that the fetal monitoring strips were "reassuring" during the first hour after the mother was admitted to the hospital.

Plaintiffs' counsel then jumped ahead to 5 a.m. Nurse Hibbs testified that from 5 a.m. to 6:30 a.m., the fetal monitoring strips showed some small decelerations as well as some changes in the baseline fetal heart rate from "the 140s, 150 to 120s." The nurse testified that the strips were neither "reassuring" nor "nonreassuring" but, rather, called for continued monitoring.

Nurse Hibbs testified that she could not interpret the fetal heart rate tracings taken between 7 a.m. and 8:13 a.m. She testified that the fetal monitoring strips taken from 8:13 a.m. to 8:45 a.m. (when the monitor was turned off), showed some decelerations, but that she could not determine the type of deceleration. The baby was delivered by cesarean section at approximately 9:10 a.m.

Plaintiffs contend that the trial court's rulings required them to edit out those portions of nurse Hibbs's evidence deposition where she gave testimony as to what the fetal monitor strip indicated about Jonathon's condition. Plaintiffs, however, have failed to provide citation to the record showing exactly what portions of nurse Hibbs's evidence deposition were edited out prior to trial. As result, the record on appeal is inadequate to review this issue. Appellants have the burden of presenting this court with an adequate record for review. Haudrich v. Howmedica, Inc., 169 Ill. 2d 525, 546-47, 662 N.E.2d 1248 (1996).

What the record does show is that the trial court stated that nurse Hibbs could describe and interpret what she observed on the fetal monitoring strips provided she did not offer any opinions as to whether the strips indicated that the baby should have been delivered earlier due to fetal distress or fetal intolerance to labor. The trial court, citing Sullivan v. Edward Hospital, 209 Ill. 2d 100, 806 N.E.2d 645 (2004), held that such issues were outside nurse Hibbs's expertise and should be determined by a medical physician. The trial court did not err in this regard.

In Illinois, a physician has a duty to exercise a reasonable amount of care and skill as is ordinarily possessed by members of his profession. Magana v. Elie, 108 Ill. App. 3d 1028, 1034, 439 N.E.2d 1319 (1982). The general rule is that when the exercise

-24-

of the proper degree of care and skill of a physician is at issue, only experts in the profession can testify and establish the standard of care and skill required. See Smith v. Pavlovich, 394 Ill. App. 3d 458, 462, 914 N.E.2d 1258 (2009), citing Dolan v. Galluzzo, 77 Ill. 2d 279, 285, 396 N.E.2d 13 (1979); Sullivan, 209 Ill. 2d at 123.  In this case the trial court properly barred nurse Hibbs from offering any opinions that the findings on the fetal monitoring strips indicated that the baby should have been delivered earlier due to fetal distress or fetal intolerance to labor, since such opinions clearly related to whether the applicable standard of care was breached.

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HOFFMAN and PATTI, JJ., concur.