2021 IL App (1st) 200952-U
Order filed: November 18, 2021

FIRST DISTRICT
FOURTH DIVISION

No. 1-20-0952

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| ELIAS RICKS, II, Individually and as Independent Administrator of the Estate of JULENE RICKS, Deceased, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 14 L 12504 |
| ADVOCATE HEALTH & HOSPITALS CORPORATION, d/b/a ADVOCATE CHRIST MEDICAL CENTER, | ) ) ) ) | Honorable Israel A. Desierto, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lampkin and Martin concurred in the judgment.

**ORDER**

¶ 1  *Held*:  We reversed the jury's verdict in favor of defendant on plaintiff's negligence action and remanded for a new trial, finding that the trial court committed reversible error by refusing to allow plaintiff to cross-examine defendant's expert with learned treatises to test the basis of the opinions that she had given on direct examination.

¶ 2  Dr. Julene Ricks died from an amniotic fluid embolism (AFE) while she was in labor at Advocate Christ Medical Center. Her husband, plaintiff Elias Ricks II, brought a survival/wrongful death action against Advocate Health & Hospitals Corporation (Advocate) and Dr. Naima Bridges, an Advocate obstetrical resident who had allegedly performed an amniotomy and intrauterine

pressure catheterization (IUPC) on Julene while also directing the application of fundal pressure to her uterus just before her death. Prior to trial, plaintiff dismissed Bridges as a defendant and the cause proceeded solely against Advocate. Advocate disclosed Bridges as a controlled expert witness under Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018), and she testified to her treatment of Julene and also provided opinion testimony regarding her compliance with the standard of care. Bridges's opinion testimony was supported by the testimony of Advocate's obstetrical experts, Dr. Gary A. Dildy III and Dr. John Hobbs, who opined that Bridges complied with the standard of care in her treatment of Julene. Plaintiff's obstetrical experts, Dr. Larry Cousins and Dr. Martin Gubernick, came to the opposite conclusion, opining that Bridges had violated the standard of care and proximately caused Julene's AFE by performing an amniotomy and IUPC while also directing the application of fundal pressure. The jury returned a general verdict for Advocate.

¶ 3    On appeal, plaintiff contends the trial court erred by sustaining Advocate's objection to his cross-examination of Bridges through the use of certain authenticated learned treatises, which had been stipulated to by the parties as being reliable. The learned treatises consisted of articles in medical journals that had been disclosed by plaintiff in his fourth amended answers to Rule 213(f)(3) interrogatories and were relied upon by Cousins to support his opinion that Bridges's performance of fundal pressure and IUPC in conjunction with the amniotomy violated the standard of care and proximately caused the AFE leading to Julene's death.

¶ 4    During plaintiff's cross-examination of Bridges, he attempted to question her about her knowledge of the content of the articles. Advocate objected on the basis that Bridges testified that she had never read them and the trial court sustained the objection. For the reasons that follow, we

find that the trial court committed reversible error by sustaining Advocate's objection to plaintiff's cross-examination of Bridges with the medical articles and remand for a new trial.

¶ 5    Testimony at the jury trial established that on December 9, 2012, Julene was a 40-year-old physician affiliated with Franciscan Alliance Medical Specialists and she was pregnant with her second child. Early that morning Julene experienced contractions, so plaintiff drove her to Advocate and they arrived at about 7 a.m. On the way to Advocate, Julene spoke to Dr. Karen Johnson, her obstetrician, who said she would meet them at the hospital.

¶ 6    A fourth-year resident physician, Dr. Julie Philbrick, examined Julene upon her arrival at Advocate and applied an external fetal monitor which showed a decrease in the fetal heart rate. Philbrick placed Julene in an observation room.

¶ 7    At about 9:30 a.m., Philbrick spoke on the phone with Johnson, and they concluded that Julene should be admitted, and her labor augmented due to her age and the decrease in the fetal heart rate. At about 10:30 a.m., Julene was transferred to a delivery room and Nurse Sylvia Parker attended to her. On Johnson's orders, Julene was given Pitocin to augment or quicken the labor process. At about 11:35 a.m., Julene received an epidural for the pain.

¶ 8    Shortly after the epidural, Bridges, a first-year resident working at Advocate pursuant to the obstetrical residency program at the University of Illinois at Chicago (UIC) examined Julene. Bridges performed a sterile vaginal examination and found that Julene's cervix (which is the neck of tissue connecting the vagina and uterus) was three to four centimeters dilated with effacement (thinning out of the cervix) at approximately 50% and that the baby's head was at minus three station. The stations range from minus three to plus three, indicating the baby's location in the birth canal relative to the mother's ischial spines. The baby's minus three station indicated that it

was high in the birth canal. Bridges reported her findings by telephone to Johnson, who was not yet at the hospital.

¶ 9    Around 1 p.m., Johnson gave a verbal order over the telephone that Bridges should speed up the labor process by performing an amniotomy or an artificial rupture of Julene's membranes, referred to as the "bag of waters." Johnson also ordered the insertion of a fetal scalp electrode to more accurately record the baby's heart rate and an intrauterine pressure catheter to measure the strength of Julene's contractions.

¶ 10    Prior to performing the amniotomy on Julene pursuant to Johnson's verbal order, Bridges had performed about 100 amniotomies during her initial residency training at UIC and was considered by Dr. Valerie Swiatkowski, the residency program director, to be a very competent resident who was able to perform amniotomies without direct supervision. Bridges testified that she was sufficiently experienced to perform the amniotomy on Julene and that if she had not felt comfortable in performing the procedure, she would have brought in a more senior physician.

¶ 11    Swiatkowski testified that residents at UIC are taught how to do an amniotomy using an amniohook to open the bag of waters. They are also taught to do an amniotomy only if the baby's head is well-applied to the cervix and not to do an amniotomy if the baby's head is ballotable, meaning that there is space between the baby's head and the cervix. If an amniotomy is performed while the baby's head is ballotable, a prolapsed cord may occur whereby the umbilical cord slips past the baby's head when the bag of waters is broken, thereby threatening the baby's blood supply. Residents were also taught to perform the amniotomy while having the patient performing a Valsalva maneuver whereby, she bears down similar to a bowel movement. The increased intrauterine pressure from the Valsalva maneuver keeps the baby's head well-applied to the cervix

and makes the amniotomy easier to perform because it forces more amniotic fluid in front of the baby's head.

¶ 12    Bridges testified that at the time she performed the amniotomy on Julene, the baby was at minus two station and its head was not ballotable. During the procedure, Bridges had Julene perform the Valsalva maneuver. Plaintiff, who was present in the room at the time of the amniotomy, testified that Bridges also told Julene to apply fundal pressure, *i.e.*, to press down on her abdomen during the procedure. Bridges testified that she did not ask Julene to apply fundal pressure. Nurse Parker, who assisted Bridges during the amniotomy, testified that she had never seen a physician order a laboring patient to apply fundal pressure to herself and that if Bridges had done so, she would have remembered it.

¶ 13    Bridges and Parker testified that Julene's amniotomy, as well as the insertion of the fetal scalp electrode and intrauterine pressure catheter, were performed in routine fashion without any initial incident. When the amniotomy was completed, the amniotic fluid did not rush out; there was only a minimal amount of fluid which was clear. This was a good sign as it indicated that the baby's head was well-applied to the cervix. No prolapsed cord occurred. After Bridges completed the amniotomy, there was blood on her glove which is normal because small blood vessels or capillaries in the cervix naturally break open due to the thinning out of the cervix and the stress of labor.

¶ 14    After initially appearing to tolerate the amniotomy well, Julene suddenly went into convulsions and became unresponsive. Julene was rushed to surgery and underwent an emergency caesarean section (C-section). Julene's baby survived, but Julene could not be resuscitated and she died.

¶ 15    The expert witnesses for both sides concluded that Julene died from an AFE, which occurs when amniotic fluid from the bag of waters in the mother's uterus enters her vascular system, causing her to suffer a serious, and often fatal, anaphylactic reaction to the fluid's content. The experts all agreed that an AFE is exceedingly rare, only occurring in about 1 out of every 40,000 pregnancies.

¶ 16    An autopsy was conducted. Dr. Marta Helenowski, the pathologist who performed the autopsy, found no trauma, cuts, tears, or other abrasions on Julene's cervix or uterus. Laboratory values indicated that Julene had suffered from a blood clotting disorder referred to as a DIC (disseminated intravascular coagulopathy), common in AFE cases. Julene lost a large amount of blood during the C-section.

¶ 17    During Advocate's direct examination of her, Bridges testified that she had been trained about AFEs in medical school, her residency program, and during continuing medical education. Based on her knowledge and training, Bridges believed that AFEs were "very rare" occurrences and were "totally unpredictable and unpreventable." When Johnson ordered her to perform the amniotomy, Bridges did not believe that she was being asked to do anything unsafe because the amniotomy was "an indicated procedure" due to the baby's non-reassuring heart tracing and the need to insert internal monitors and to augment labor.

¶ 18    Based on her knowledge of various obstetrical textbooks, but most particularly a textbook entitled "Gabbe and Williams on obstetrics," Bridges understood that fundal pressure is usually performed by a care provider, not the patient, and is an approved technique during an amniotomy. The application of fundal pressure was not within the scope of her practice on December 9, 2012, because she had not yet been taught how to properly perform the procedure. Bridges maintained

that she did not ask Julene to apply fundal pressure to herself. Bridges testified that she "fully complied with the standard of care" in all of her treatment of Julene on December 9, 2012.

¶ 19    On cross-examination by plaintiff, Bridges testified that she had not read any of the medical articles disclosed in plaintiff's fourth amended answers to Rule 213(f)(3) interrogatories which allegedly supported Cousins's opinion that she had not complied with the standard of care. She also stated that she was not aware of the articles that discussed the risk of perineum lacerations with the use of fundal pressure and the danger of endocervical veins being injured by too much pressure within the uterus. When Bridges was asked about one of the disclosed articles discussing eight cases in Sweden where AFEs were found to have been related to fundal pressure, Advocate objected on the grounds that she had not read the article. The objection was sustained.

¶ 20    Plaintiff's obstetrical expert, Dr. Cousins, testified that he had reviewed the external monitor tracings used on Julene to detect and trace the fetal heart rate and uterine contractions prior to the amniotomy. Cousins opined that the tracings were reassuring, the baby was doing fine, and that there was no need to break the bag of waters to place internal monitors. Cousins testified that Bridges violated the standard of care by performing the amniotomy with the tracings being reassuring, with the baby being at a high station of either minus two or minus three and without a staff physician present to supervise her. Cousins also opined that fundal pressure was employed, which was a breach of the standard of care, and he concluded that Bridges's performance of the amniotomy, while employing fundal pressure, proximately caused the AFE leading to Julene's death.

¶ 21    Cousins testified to the authoritative nature of all the medical articles disclosed in the fourth amended answers to the Rule 213(f)(3) interrogatories and he stated that they supported his

opinions regarding Bridges's alleged violations of the standard of care that proximately caused the AFE leading to Julene's death.

¶ 22    Plaintiff's other obstetrical expert, Dr. Gubernick, similarly testified that Bridges violated the standard of care by performing the amniotomy on Julene while the baby was at a high station and by directing the application of fundal pressure during the procedure, all of which together proximately caused the AFE leading to Julene's death.

¶ 23    Plaintiff's forensic epidemiologist expert, Dr. Michael Freeman, testified that the majority of AFEs do not result spontaneously, but rather about 99% of them occur as a result of  some type of medical procedure which inadvertently causes amniotic fluid to enter the mother's vascular system. Cervical lacerations and IUPCs increase the risks of an AFE. Freeman found no statistical indication that amniotomies or fundal pressure increase the risks of an AFE.

¶ 24    Plaintiff's expert in forensic pathology, Dr. Kris Sperry, testified to his opinion that Julene's AFE developed because of the fundal pressure that resulted when she pushed down on her uterus and lower body during the amniotomy. He testified about the autopsy photographs showing hemorrhaging in her inner abdominal wall which he believed resulted from her pushing down too hard on herself. However, Sperry agreed that if Bridges's and Parker's testimony was correct and that no fundal pressure was applied, the hemorrhage could be explained by the C-section.

¶ 25    Advocate's expert forensic pathologist Dr. Jane Turner testified that Julene's hemorrhage was underneath numerous layers of skin, subcutaneous fat, rectus or central abdominal muscles, and the membrane lining the abdominal cavity. None of those layers had any bruising or evidence of trauma that one would expect to find if the hemorrhage was caused by external fundal pressure. Instead, the hemorrhage reflected the fact that Julene underwent an emergency C-section with

manipulation of instrumentation in the pelvic area. Turner explained that the hemorrhage could have been caused by the retractors used during the C-section or by the blunt dissection that occurred when the surgeon used his fingers to widen the uterine incision or by the blood clotting disorder (DIC) that Julene suffered during the AFE.

¶ 26    Advocate's obstetrical experts, Dr. Dildy and Dr. Hobbs, testified that it is reasonable and common for first-year obstetrical residents with Bridges's experience to perform amniotomies without direct supervision. Dildy and Hobbs further testified that AFEs are unpredictable and unpreventable and that none of the care or treatment rendered by Bridges to Julene, including the amniotomy, violated the standard of care or was a proximate cause of her AFE.

¶ 27    Dildy and Hobbs each testified that fundal pressure may be utilized while performing an amniotomy. Hobbs testified that although plaintiff stated that he observed Bridges direct Julene to perform fundal pressure on herself, it was more likely that Bridges was asking her to perform the Valsalva maneuver. Dildy testified that even if Bridges directed Julene to perform fundal pressure on herself, such pressure would not have hurt Julene or the baby.

¶ 28    On cross-examination, Dildy testified that he had reviewed all the medical articles disclosed in plaintiff's fourth amended answers to Rule 213(f)(3) interrogatories. He agreed with the articles' conclusions that fundal pressure can cause uterine rupture and perineal and cervical laceration in some cases.

¶ 29    Hobbs testified on cross-examination that he only looked at "some" of the disclosed articles but that he had not read any of the articles discussing how fundal pressure can cause an AFE to occur.

¶ 30    Philbrick and Turner testified, similarly to Dildy, Hobbs, and Bridges, about the unpredictability and unpreventability of AFEs.

¶ 31    Following all the evidence, the case went to the jury on two theories. The first theory was an institutional negligence claim against Advocate asserting that Julene's death was caused by Advocate's failure to adequately supervise or train Bridges or by Advocate's allowing her to perform an amniotomy when the baby was at a high station. The second theory was a vicarious liability claim against Advocate for Bridges's alleged negligence.

¶ 32    The jury returned a general verdict in favor of Advocate. Plaintiff filed a motion for a new trial that the court denied. Plaintiff appeals.

¶ 33    Initially, Advocate argues that we should dismiss plaintiff's appeal because he violated Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) by failing to set forth all the relevant facts, specifically, the testimony of the defense experts. While we have the authority to strike plaintiff's statement of facts or dismiss his appeal due to violations of Rule 341(h)(6), we will not do so in the instant case as any violations do not hinder our review. See *O'Gorman v. F.H. Paschen, S.N. Nielsen, Inc.*, 2015 IL App (1st) 133472, ¶ 80. We proceed to address the merits of the appeal.

¶ 34    First, plaintiff argues that the trial court erred by sustaining Advocate's objection to his cross-examination of its Rule 213(f)(3) expert, Bridges, through the use of the articles in the medical journals that had been disclosed during discovery and stipulated to as being reliable, and which discussed how fundal pressure and/or an amniotomy or IUPC can lead to an AFE.

¶ 35    Cross-examination is the principal safeguard against errant expert testimony. *Sharbono v. Hilborn*, 2014 IL App (3d) 120597, ¶ 36. Wide latitude is to be granted counsel on cross-examination of an expert under Rule 213 and pursuant to "longstanding and well accepted case law." *Jackson ex rel. Jackson v. Reid*, 402 Ill. App. 3d 215, 234 (2010). On cross-examination, counsel may probe an expert witness's qualifications, experience, and sincerity, as well as the basis

and general soundness of her opinions. *Karn v. Aspen Commercial Painting, Inc.*, 2019 IL App (1st) 173194, ¶ 16. The admissibility of evidence and the scope of cross-examination of expert witnesses is a matter for the sound discretion of the trial court and its decision will not be reversed on appeal unless that discretion was abused. *Iaccino v. Anderson*, 406 Ill. App. 3d 397, 408 (2010).

¶ 36    Advocate's objection to plaintiff's cross-examination of Bridges was sustained on the basis that Bridges had not read the articles in question.[1] However, plaintiff contends that even if Bridges never read the articles, she was subject to be cross-examined with them to show the basis of her expert opinions where, as here, the articles are recognized as reliable authority.

¶ 37    In support, plaintiff cites *Reilly v. Pinkus*, 70 S. Ct. 110 (1949), *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 336 (1965), and *Iaccino v. Anderson*, 406 Ill. App. 3d 397 (2010). In *Reilly*, respondent (Pinkus) had sent representations through the mail about his anti-fat treatment, nationally advertised under the name "Dr. Phillips' Kelp-I-Dine Reducing Plan." *Reilly*, 70 S. Ct. at 112. Kelp-I-Dine was a name used by respondent for granulated kelp, a natural seaweed product containing iodine. *Id.* Respondent's advertisements made expansive claims for his plan, specifically, that a half teaspoon of Kelp-I-Dine per day would enable the user to lose 3 to 5 pounds per week while still being able to eat ice cream, cake, and candy. *Id.*

¶ 38    A hearing was conducted to determine whether these representations were fraudulent. *Id.* at 111. Two doctors with general knowledge of dietetics and treatment for obesity were called by

---

[1] When sustaining Advocate's objection, the trial court also alluded to an opposing party's lesser ability to cross-examine a treating physician about her medical opinions versus cross-examining a retained expert who was not also the treating physician. To the extent, if any, that the court's ruling was premised on this perceived distinction between cross-examining a treating physician and cross-examining a retained expert, we note our holding in *Kim v. Evanston Hospital*, 240 Ill. App. 3d 881, 890 (1992) that "an opposing party should have the same ability to cross-examine a treating physician [about her medical opinions] that he would have in cross-examining a retained expert." Accordingly, plaintiff had the same ability to cross-examine Bridges about the medical articles to show the basis of her opinions as he did to cross-examine the other retained experts.

the government. *Id.* at 112. They testified that iodine is useless as an anti-fat, that kelp would not reduce hunger, and that the suggested diet was too drastic to be safe for use without medical supervision. *Id.* Respondent called one physician who testified that iodine had value as a weight reducer, but even he conceded that the daily dosage of iodine to reduce weight would be 50 to 60 times more than the iodine in respondent's daily dosage of kelp and that the recommended diet could prove harmful. *Id.*

¶ 39    Following all the evidence at the hearing, the Postmaster General found that respondent's representations regarding the efficacy of his Kelp-I-Dine Reducing Plan were fraudulent and issued an order restricting respondent's use of the mails. *Id.* at 111.

¶ 40    The district court granted an injunction against enforcement of the fraud order, finding that the testimony of the two doctors upon which the government's case rested "was reduced by the conflicting testimony of respondent's witness to the status of mere opinion" and, as such, that the order was unsupported by factual evidence. *Id.* at 112. The court of appeals affirmed on substantially the same ground. *Id.*

¶ 41    The United States Supreme Court held that there was sufficient evidence to support the finding that the efficacy of respondent's "Reducing Plan" was misrepresented in his advertising. *Id.* at 113. However, the Supreme Court held that the fraud order could not be enforced, stating:

"It has been pointed out that the [government] doctors' expert evidence rested on their general professional knowledge. To some extent this knowledge was acquired from medical textbooks and publications, on which these experts placed reliance. In cross-examination respondent sought to question these witnesses concerning statements in other medical books, some of which at least were shown to be respectable authorities. The questions were not permitted. We think this was an undue restriction on the right to cross-

examine. It certainly is illogical, if not actually unfair, to permit witnesses to give expert opinions based on book knowledge, and then deprive the party challenging such evidence of all opportunity to interrogate them about divergent opinions expressed in other reputable books." *Id.* at 114.

¶ 42 The Supreme Court further stated that "the object of using the books on cross-examination was to test the expert's testimony by having him refer to and comment upon their contents. Respondent was deprived of this opportunity." *Id.* Such an error was not harmless, even where the fact-finder at the fraud hearing indicated that he had read the excluded materials and would have made the same adverse findings had the materials been held admissible. *Id.*

¶ 43 In *Darling*, an action was brought against the Charleston Community Memorial Hospital and Dr. John R. Alexander by plaintiff's father and next friend to recover damages for allegedly negligent medical and hospital treatment necessitating the amputation of his right leg below the knee. *Darling*, 33 Ill. 2d at 328. The jury returned a verdict against the hospital. *Id.*

¶ 44 On appeal to the Illinois Supreme Court (the *Darling* court), the hospital argued that the trial court erred by permitting plaintiff to cross-examine its expert witnesses about the views of recognized authorities in their fields where the experts did not base their opinions upon the views of these authorities. *Id.* at 335. In support, the hospital cited *Ullrich v. Chicago City Railway Co.*, 265 Ill. 338 (1914) and *City of Bloomington v. Shrock*, 110 Ill. 219 (1884), which articulated the rule that an expert witness can only be interrogated about texts upon which he expressly based his opinions. The *Darling* court held that the rule announced in those cases should no longer be adhered to, as it had been rejected by the United States Supreme Court in *Reilly v. Pinkus* and by other courts as well. *Darling*, 33 Ill. 2d at 335. The *Darling* court stated:

"An individual becomes an expert by studying and absorbing a body of knowledge. To prevent cross-examination upon the relevant body of knowledge serves only to protect the ignorant or unscrupulous expert witness. In our opinion expert testimony will be a more effective tool in the attainment of justice if cross-examination is permitted as to the views of recognized authorities, expressed in treatises or periodicals written for professional colleagues." *Id.* at 336.

¶ 45    In *Iaccino*, plaintiffs, the parents of an infant who sustained a brain injury during labor as a result of oxygen deprivation, brought a medical malpractice action against defendants, Dr. Lori L. Anderson and Dr. Linda R. Gibson. *Iaccino*, 406 Ill. App. 3d at 399-400. The jury returned a general verdict in favor of defendants and against plaintiffs. *Id.* at 401.

¶ 46    On appeal, plaintiffs argued that the trial court abused its discretion by permitting defendants to cross-examine their expert witnesses using three medical articles without first establishing the requisite foundation as to the authoritativeness of those articles. *Id.* at 408. We held that an expert may be cross-examined with articles and treatises he does not recognize, provided that those publications are established as authoritative. *Id.* We found that the trial court did not abuse its discretion in permitting defendants to cross-examine plaintiffs' expert witnesses about the medical articles, as they had either been reviewed by plaintiffs' expert witnesses or were established to be authoritative by other expert witnesses. *Id.* at 409.

¶ 47    Based on *Reilly*, *Darling*, and *Iaccino*, plaintiff contends that the trial court should have allowed him to cross-examine Bridges regarding her awareness of the articles in the medical journals which identified fundal pressure, amniotomies, and IUPC as causes of an AFE. Plaintiff argues that since the parties stipulated to the reliability of the articles and Cousins testified that

they were authoritative, Bridges was subject to be cross-examined about her knowledge of their contents even though she had never read them.

¶ 48    We agree that the trial court erred by sustaining Advocate's objection to plaintiff's cross-examination of Bridges about the articles. Bridges had previously given opinion testimony on direct examination regarding how she fully complied with the standard of care in her treatment of Julene. She also testified that she was trained and educated about AFEs. She expressed the opinion that the amniotomy was indicated and that she had no concerns that she was "doing something unsafe" for Julene by performing the amniotomy on her. Plaintiff had the right to cross-examine Bridges with the articles in the medical journals, which both parties previously stipulated were reasonably relied on by the experts and which Cousins also later testified were authoritative, in order to discredit her testimony on direct examination by showing that she disregarded certain risks that an AFE could result from fundal pressure, IUPC, or from an amniotomy. Such cross-examination would have tested the basis of Bridges's opinions and her position that she was qualified and experienced enough to conduct the amniotomy under the circumstances presented and that she complied with the standard of care. See *Karn*, 2019 IL App (1st) 173194, ¶ 17 (the trial court erred by precluding plaintiff from cross-examining defendant's expert witness about the basis of his opinion).

¶ 49    Advocate argues that plaintiff suffered no prejudice by the court's error, because during adverse direct examination and recross-examination, plaintiff was able to elicit testimony from Bridges that she was unaware of the association between AFE and amniotomies, fundal pressure and IUPC. Advocate contends that plaintiff's cross-examination of Bridges with the medical articles would have elicited the very same testimony, amounting to cumulative evidence. The

exclusion of cumulative evidence is harmless. See *Aguinaga v. City of Chicago*, 243 Ill. App. 3d 552, 573 (1993).

¶ 50    We reject Advocate's harmless error argument. Review of the trial transcript shows that Bridges testified during recross-examination that she knew of no risk of an AFE resulting from fundal pressure, but she was never asked, either on adverse direct examination or recross-examination, about her knowledge of the risks, discussed in the medical articles, that an AFE could also result from the amniotomy and IUPC. As Bridges's adverse direct examination and recross-examination did not address her knowledge of the risks of an AFE resulting from the amniotomy and IUPC, we cannot say that the excluded testimony on cross-examination regarding her knowledge of those risks would have been cumulative.

¶ 51    Advocate also argues there was no prejudice because plaintiff questioned Cousins and Dildy about the content of the articles, which was shown to the jury on a screen in the courtroom, meaning that the jury was informed about all the information contained therein regarding the risks of an AFE associated with amniotomies, fundal pressure, and IUPC. However, as discussed earlier in this order, the United States Supreme Court has held that the object of cross-examining an expert with treatises is to test her opinions by having *her* refer to and comment on their contents; the error cannot be cured by having the fact-finder examine the material or by having a different expert testify to its contents. See *Reilly*, 70 S. Ct. at 114.[2]

---

[2] Plaintiff also cites *Perez v. St. Alexius Medical Center*, 2020 IL App (1st) 181887 as supporting a finding that he was prejudiced by the trial court's error. Defendants filed petitions for rehearing in *Perez* on October 8, 2020, which remain outstanding, and as a result the opinion has not yet been released for publication in the permanent law reports and is subject to revision or withdrawal. On September 22, 2021, a different panel of this court entered an order in *Perez* stating that the disposition of the petitions for rehearing will be "forthcoming." Given this lack of finality surrounding the disposition in *Perez*, we choose not to consider it as authority here.

¶ 52    Advocate argues that an incorrect evidentiary ruling does not warrant reversal unless the error materially affected the outcome of the trial (see *Karn*, 2019 IL App (1st) 173194, ¶ 19) and that on the facts of this case, the court's error was harmless as it did not materially affect the jury's verdict. We disagree. This was a close case involving dueling expert testimony. Plaintiff's multiple experts opined that Bridges breached the standard of care and proximately caused the AFE leading to Julene's death; Advocate's multiple experts, including Bridges herself on direct examination by Advocate, opined that she did not breach the standard of care. It was the jury's duty to consider all the experts' credibility and determine how much weight to be given each expert's testimony. *Sharbono*, 2014 IL App (3d) 120597, ¶ 26. By erroneously preventing plaintiff from cross-examining Bridges with the medical articles to test the basis of her opinion that the amniotomy was indicated and that she complied with the standard of care, the trial court deprived the jury of evidence that was relevant when weighing and comparing Bridges's opinion testimony with the other experts' testimony. On this record, given the closeness of the case, we cannot say that the error was harmless. See *Karn*, 2019 IL App (1st) 173194, ¶ 22 (given the battle of the experts at trial, the court's error in denying plaintiff the opportunity on cross-examination to test the basis of the opinion of defendant's expert witness necessitated a new trial).

¶ 53    Finally, Advocate argues that under the two-issue rule, we may affirm the jury's general verdict on the basis of the defense asserted at trial that Bridges's conduct did not proximately cause Julene's death. Under the two-issue rule, a general verdict will not be disturbed on review where the case involved two or more causes of action or defenses and there was sufficient evidence to support at least one of the issues or defenses presented to the jury free from error. *Robinson v. Boffa*, 402 Ill. App. 3d 401, 406 (2010).

¶ 54    In the present case, we cannot say that the defense of lack of proximate cause was presented to the jury free from error, where the court's refusal to allow plaintiff to cross-examine Bridges with the medical articles prevented him from questioning her about her understanding of the causal connection between amniotomies and AFEs. Therefore, the two-issue rule does not apply to the claim of error in this case.

¶ 55    Before concluding, we address one other issue raised by plaintiff that may occur on retrial. Plaintiff argues that the trial court erred by sustaining Advocate's Rule 213 objection to the testimony of his expert, Cousins, who stated that if Bridges believed that there was a "worrisome change in either the baby's status or the mom's status," then she should have reported it to the attending physician prior to performing the amniotomy. Plaintiff contends that the court erred in sustaining the Rule 213 objection because Cousins's trial testimony was encompassed in his disclosure prior to trial. Specifically, in his pre-trial disclosure, Cousins stated that Bridges violated the standard of care by failing to report concerns over the fetal heart tracings to a more senior physician.

¶ 56    The purpose of discovery rules, which govern the timely disclosure of expert witnesses, their opinions and bases therefor, is to avoid surprise and discourage strategic gamesmanship among the parties. *Morrisroe v. Pantano*, 2016 IL App (1st) 143605, ¶ 37. Rule 213(f)(3) states:

> "A 'controlled expert witness' is a person giving testimony who is the party, the party's current employee, or the party's retained expert. For each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018).

¶ 57    Rule 213(g) limits expert opinions at trial to the information disclosed in answer to a Rule 213(f) interrogatory or in a discovery deposition. Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2018). Rule 213 disclosures are mandatory, requiring strict compliance. *Pantano*, 2016 IL App (1st) 143605, ¶ 37. An expert witness may expand on a disclosed opinion as long as the testimony states a logical corollary to the disclosed opinion and not a new basis for the opinion. *Id.* In other words, the testimony must be encompassed by the original opinion. *Id.* Faced with a challenge that testimony was not disclosed or exceeds the scope of Rule 213 disclosure, the trial court's ruling on the admission of evidence will not be disturbed absent an abuse of discretion. *Steele v. Provena Hospitals*, 2013 IL App (3d ) 110374, ¶ 93.

¶ 58    In the present case, Cousins disclosed in his answers to Rule 213(f)(3) interrogatories that in his opinion, Bridges violated the standard of care by performing the amniotomy without any medical indication and before consulting a more senior physician. Cousins further opined in his discovery deposition that Bridges violated the standard of care by interpreting the fetal heart tracing as "nonreassuring" and by failing to bring her concerns to a more senior physician. Cousins's testimony at trial regarding how Bridges should have reported any "worrisome change" in the baby's status to the attending physician was a logical corollary to his deposition testimony and therefore it was encompassed within his Rule 213 disclosure. Accordingly, the trial court erred by sustaining Advocate's Rule 213 objection to Cousins's testimony. On retrial, Cousins should be permitted to testify to his opinion that Bridges should have reported any worrisome change in the baby's status to the attending physician.

¶ 59    For all the foregoing reasons, we reverse and remand for a new trial. As a result of our disposition of this case, we need not address the other arguments on appeal, as they involve alleged errors that are not likely to recur on retrial.

¶ 60    Reversed and remanded.