2024 IL App (1st) 220532-U

Fourth Division
Filed September 19, 2024

No. 1-22-0532

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| BARRY D. GOLDBERG, Independent Executor of the Estate of Barth H. Goldberg, Deceased,<br><br>　　Plaintiff-Appellant,<br><br>　v.<br><br>NORTHWESTERN LAKE FOREST HOSPITAL, NORTHWESTERN MEDICAL FACULTY FOUNDATION, STEVEN HODGES, M.D., and NORTHWESTERN MEDICINE INSURANCE COMPANY,<br><br>　　Defendants<br><br>(Northwestern Medical Faculty Foundation and Steven Hodges, M.D., Defendants-Appellees). | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )　Appeal from the<br>Circuit Court of Cook County<br><br>No. 2017 L 004156<br><br>The Honorable John P. Callahan, Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Rochford and Justice Martin concurred in the judgment.

**ORDER**

¶ 1　　*Held:*　The judgment was reversed, and the cause remanded for a new trial, where the trial court abused its discretion by not barring evidence and commentary about the nominal plaintiff's assertion of the physician-patient privilege as to his own health history and the ensuing litigation over the discovery of the nominal plaintiff's medical records.

¶ 2　　This medical-malpractice and wrongful-death action was brought by plaintiff Barry D. Goldberg in his capacity as the executor of his twin brother Barth H. Goldberg's estate (the Estate)

against several named defendants, including Northwestern Medical Faculty Foundation and Steven Hodges, M.D. (the Defendants). Although Barry brought the suit on the Estate's behalf, the real parties in interest are the Estate's beneficiaries: Barth's widow (Angela) and his four children (Brittney, Jeremy, Robert, and Lindsay). The Estate's theory of the case was that Dr. Hodges, an emergency-department physician at Northwestern Lake Forest Hospital (NLF Hospital), failed to identify and take steps to treat a thoracic aortic dissection—a dangerous condition where blood begins to flow into the wall of the body's main artery—that caused Barth's death. After a month-long trial, a jury found in favor of the Defendants.

¶ 3        On appeal, the Estate argues the trial court erred when it allowed the defense to elicit prejudicial evidence showing that (1) Barry attempted to impede the Defendants' efforts to obtain information about a thoracic aortic dissection he had sustained twenty years before Barth's death, (2) the Estate filed suit before obtaining a report from a health professional, and (3) an expert retained by the Estate prematurely discarded heart tissue collected during Barth's autopsy. We hold that the court abused its discretion by allowing the defense to elicit evidence about Barry's allegedly obstructive conduct during discovery and that, in the context of this case, that error was not harmless. Accordingly, we reverse and remand for a new trial.

¶ 4                                I.  BACKGROUND

¶ 5        The record in this case, which involved four years of pretrial litigation followed by a month-long jury trial, is extensive. We recite only what is necessary to understand the issues raised on appeal.

¶ 6                          A.  Barth's Death in 2015

¶ 7        The historical facts of the case are, for the most part, uncontested. At around 1:45 p.m. on April 27, 2015, 72-year-old Barth Goldberg arrived at NLF Hospital's emergency department. He was evaluated by a triage nurse, who noted that he was complaining of back and neck pain. Angela, who accompanied Barth to the hospital, told the nurse that Barth was acting differently

since falling off his bed and hitting his head on a side table. The nurse also noted that Barth's gait was unsteady and that he was taking Plavix, a blood thinner.

¶ 8 Dr. Hodges, one of the on-duty physicians, reviewed the triage notes. Based on the fact that Barth had fallen at home and was on a blood thinner, Dr. Hodges immediately ordered a CT scan of Barth's brain. He then met with Barth, who reported that he had fallen off his bed while reading and hit his head on a nightstand. Dr. Hodges noted that Barth had difficulty providing a full account of the fall and that, per Angela, Barth seemed confused and was having trouble walking. No family history was noted—a fact that would later become significant in this litigation.

¶ 9 After meeting with Barth, Dr. Hodges put in several additional orders, including for additional imaging of Barth's face, chest, and spine and for a blood draw to test for cardiac enzymes that would be indicative of a heart attack or other heart damage. The CT scan of the brain showed that Barth had a subdural hematoma, a kind of internal bleeding in the brain. After examining the results of the scans and other tests, though, Dr. Hodges concluded that the hematoma did not explain Barth's speech and gait difficulties. At around 3:30 p.m., he ordered a consultation with a neurologist, who concluded that those symptoms were likely to be caused by some kind of intoxication or metabolic process.

¶ 10 Dr. Hodges finished his shift at around 4:00 p.m., and responsibility for Barth's care was transferred to another physician, who continued investigating possible explanations for Barth's symptoms. Barth was admitted to the hospital and, at around 5:45 p.m., transferred to the intensive care unit so his hematoma could be monitored. At 7:40 p.m., Barth had a seizure that ended when he was given an antiseizure medication. Not long after that, at 8:02 p.m., Barth's heart stopped. Efforts to resuscitate him failed, and he was pronounced dead. He was buried at a cemetery in Lake County shortly thereafter.

¶ 11 B. The Estate's Lawsuit

¶ 12 After Barth's death, his twin brother Barry, with whom Barth had worked at the firm Goldberg & Goldberg, assumed the role of independent executor of Barth's estate. On April 25,

2017, two days before the expiration of the statute of limitations, the Estate filed a five-count complaint against NLF Hospital, Northwestern Medical Faculty Foundation, Dr. Hodges, and three other doctors who had been involved with Barth's care at NLF Hospital. Attached to the complaint was counsel's certification that the impending statute of limitations prevented him from consulting with a qualified health professional before commencing the action. See 735 ILCS 5/2-622(a)(2) (West 2016).

¶ 13        In September 2017, the Estate filed an affidavit sworn to by a Goldberg & Goldberg attorney averring that there was a reasonable and meritorious cause for the action.[1] See *id.* § 2-622(a)(1). A medical report attached to the affidavit opined that an aortic dissection was the "leading explanation of the cause of death." It also asserted that Barry had "previously suffered an aortic dissection that was treated by cardiovascular surgery," that NLF Hospital personnel "should have inquired whether there was a family history of aortic dissection," and that, had they made the appropriate inquiry, it was "virtually certain that *** Barth would have told the ED team of this family history and it would have changed the course of his care and its outcome."

¶ 14        Eight days later, on September 27, the court entered an agreed protective order authorizing the exhumation of Barth's remains for the purpose of an autopsy. The order specified that the autopsy would be conducted by pathologists retained by the Estate, but it permitted the defense's pathologist to be present and to request particular examinations. The order also provided for the Estate's pathologists, Dr. Michael Kaufman and Dr. Jennifer Bero-Alferi, to collect pathologic specimens, including those requested by the defense pathologist, Dr. Scott Denton. It contained this provision governing custody and retention of any specimens collected during the autopsy:

> "Retention and preservation of pathologic specimens. Plaintiff's retained
> pathologist, Dr. Kaufman, shall be responsible for taking initial custody of

---

[1]    Although Goldberg & Goldberg represented the Estate in the court below, the attorney who filed the complaint and who served as the lead attorney throughout the trial-court proceedings was not affiliated with Goldberg & Goldberg.

and preserving all collected pathologic specimens following the autopsy. No transfer or [*sic*] custody of specimens shall be required except on terms agreed to by the parties or ordered by the court. Upon any subsequent transfer of custody of any pathologic specimens, the party and/or party's representative taking custody of the specimens shall assume responsibility for retention and preservation of such specimens."

The protective order further provided that, after the autopsy, Dr. Kaufman would be responsible for preparing two sets of pathology slides, one for him to retain and one for Dr. Denton to retain. Thereafter, any "[t]ender of custody of pathology specimens or slides taken and/or created as a result of the autopsy" would only be permitted by agreement or a court order.

¶ 15 The autopsy took place on October 3, 2017, and it confirmed that Barth had experienced an aortic dissection. The body had not been embalmed prior to burial, so there was significant deterioration. One consequence was that some of the internal organs, including the heart, were, in the words of Dr. Kaufman, "trying to fall apart." Because cutting small samples from the heart during the autopsy risked collapse, the entire heart was collected so it could be "fix[ed]" using formaldehyde, which would result in firmer tissues that were easier to cut into for making slides. The samples collected during the autopsy were not taken by Dr. Kaufman. Instead, the Estate's other pathologist, Dr. Bero-Alferi, took custody of the samples and used them to make the slides contemplated by the protective order. After making two sets of slides, Dr. Bero-Alferi discarded the remaining tissue.

¶ 16 About two weeks after the autopsy, on October 18, 2017, the Estate filed an amended complaint. Among other changes, the amended complaint included a new allegation that NLF Hospital physicians deviated from the applicable standard of care when they did not "take an adequate family history including as to whether any immediate family member of [Barth] had suffered a large vessel dissection."

¶ 17 At some point after receiving the section 2-622 report, the Defendants served the Estate with a set of interrogatories requesting information about the circumstances of Barry's aortic

dissection, including the date it was diagnosed, the doctors who diagnosed or treated it, and the facilities it was diagnosed or treated at. The Estate initially objected to those requests on the ground that they were irrelevant requests for the privileged health-care information of a nonparty. It later amended its answer to include a general objection to any requests directed at Barry personally, rather than as the nominal representative of the estate:

> "Plaintiff, BARRY D. GOLDBERG, executor of the Estate of Barth H. Goldberg, deceased, objects to the Defendants' Supplemental Rule 214 production request [*sic*] insofar as it seeks documents that are personal property of BARRY D. GOLDBERG, d/b/a GOLDBERG & GOLDBERG, and are not in the possession of Barry D. Goldberg in his capacity as executor of Barth H. Goldberg's estate. It is the position of Barry D. Goldberg that, in undertaking the nominal representation of [*sic*] executor off [*sic*] Barth H. Goldberg's estate, he has not waived his personal rights and that all such documents must be sought through discovery served on him personally so that he may resist it personally, or through his personal counsel, free of any conflicts of interest."

It appears from the record that, during conferences meant to resolve the dispute, Barry asserted that the requested information was protected by the physician-patient privilege.

¶ 18     When the parties failed to reach an informal resolution, the Defendants filed a motion to compel the Estate to answer the interrogatories and compel Barry to execute an authorization allowing the disclosure of any of his medical records related to his aortic dissection. The motion to compel argued that Barry waived any privilege by placing his own medical condition at issue with the section 2-622 medical professional's report. Alternatively, the Defendants asked the court to bar the Estate from relying on the theory that NLF Hospital medical personnel should have inquired into a family history of aortic dissections when treating Barth. The Estate filed a response reasserting that Barry was only the nominal plaintiff, not the real party in interest. It also argued that, although the fact that Barry had suffered an aortic dissection was relevant to whether Barth

or Angela would have disclosed that there was a family history of aortic dissection, the particular circumstances under which Barry's dissection was diagnosed and treated were not.

¶ 19 While the motion to compel was pending, in June 2018, the parties agreed that Barry would voluntarily answer the interrogatories and that the Defendants would not argue that his answers would constitute a waiver of any privileges. The court later denied the motion insofar as it sought to compel Barry to provide a signed authorization to disclose medical records or to bar the Estate from relying on the family-history theory.

¶ 20 Despite this agreement, issues about Barry's medical records persisted. In July 2018, Barry consented to a limited waiver of his privilege to allow the Defendants to obtain the operative report from his aortic dissection, and in August 2018, the Estate issued subpoenas to two hospitals requesting "[a]ny and all medical records relating to [the] care and treatment of Barry D. Goldberg" between January 1, 1995, and December 31, 1998. The first hospital, Rush University Medical Center, responded that it found "no records for [the] date(s) of service requested." The second hospital, Presence St. Joseph Hospital, responded that it could not comply with the subpoena because the records for the applicable period had been destroyed under its 12-year retention policy. During a separate search of insurance records, the Estate found a 2007 letter from Barry's cardiologist, Dr. Ramesh Chhablani, to his internist relating that Barry had developed a Type 1 aortic dissection in May 1996, which was surgically repaired by Dr. Marshall David Goldin. After an *in camera* review, the Estate turned over a redacted copy of the letter to the Defendants. At the prompting of the Defendants, the Estate sent another subpoena to Rush, specifically addressing it to the supervisor of the records department. This time, Rush turned up roughly 100 pages of Barry's medical records, which were sent directly to the court. After an *in camera* review, the motion judge turned over the portion of those records related to Barry's thoracic aortic dissection to the parties.

¶ 21 C. Motions *in Limine*

¶ 22 The matter was certified for trial, which was then set for October 2021. Between them, the parties filed more than one hundred motions *in limine*. Four are relevant to this appeal.

¶ 23                    1.  Barry Goldberg's Thoracic Aortic Dissection

¶ 24       Both the Estate and the Defendants filed motions *in limine* related to Barry's aortic dissection. The Estate's motion sought to bar testimony or attorney comment that Barry had objected to discovery of his medical records, tried or was trying to hide his records, or asserted any health or medical privileges; it also sought to bar any disclosure that the court had issued a ruling governing what parts of his medical records were discoverable. The Defendants' motion asked the court to bar entirely any reference to Barry's thoracic aortic dissection on the ground that they had not been able to obtain full discovery of his medical records. The court denied both requests. It told the Estate to make sure that Dr. Goldin was ready to testify about the procedure to repair Barry's thoracic aortic dissection, and it indicated that the Defendants would be able to cross-examine about any information that might be brought out on direct examination of Barry and Dr. Goldin.

¶ 25       Two days before jury selection began, the defense filed a motion to compel the Estate to produce any medical records concerning Barry's thoracic aortic dissection that were in the possession of counsel, Barry, Barry's treating physicians, or the Estate's experts. After reviewing roughly one hundred pages of records *in camera*, the court required the Estate to produce the same five pages that the motion judge had already tendered to the Defendants during pretrial discovery.

¶ 26                          2.  Timing of the Complaint

¶ 27       In another motion *in limine*, the Estate asked the trial court to bar defense counsel from informing the jury that the Estate had filed suit before consulting with a physician, which it was permitted to do by section 2-622 (a)(2) of the Civil Practice Law. 735 ILCS 5/2-622(a)(2) (West 2016). It argued that the timing of the complaint was irrelevant and that the only purpose for presenting evidence about that timing would be "to make the jury think we're shysters, to put it bluntly, that we filed suit without knowing we had any basis to do so." The court denied the motion, but it indicated that the Estate could elicit testimony explaining why it filed the original complaint when it did.

¶ 28                          3.  Discarded Autopsy Samples

¶ 29      Another of the Estate's motions *in limine* asked the court to prohibit Dr. Denton from testifying that "plaintiff's attorneys generally maintain pathology slides or are in any way responsible for maintaining pathology slides." At the hearing on the motions *in limine*, counsel for the Estate clarified that it was seeking to bar testimony that "the plaintiff's lawyers violated some customary practice *** to preserve autopsy tissues," not slides, "until the end of the case." Counsel for the Defendants indicated that he did not believe he would have a witness who would testify to such a practice, but he would look at whatever the Estate's lawyer pointed him to. The court reserved a ruling at the hearing, and the record shows that it ultimately denied the motion.

¶ 30                                   D.  Trial

¶ 31      A month-long jury trial was held in October and November 2021.[2] As there was no dispute that Barry had suffered an aortic dissection, the key disputes at trial were over the timing, detectability, and medical consequences of that aortic dissection. Each party called several expert witnesses to opine on those, and other, topics.

¶ 32                                 1.  Overview

¶ 33      As noted above, the Estate's theory of the case was that Barth had died from a thoracic aortic dissection that should have been detected by Dr. Hodges, which would have allowed enough time to treat him. Among the experts who testified in support of that theory were Dr. Roger M. Barkin (an emergency-medicine specialist), Dr. Goldin (a cardiovascular thoracic surgeon), Dr. Jesse Hall (a hospitalist and critical-care specialist), Dr. Kaufman (a pathologist), Dr. Harel Deutsch (a neurosurgeon), and Dr. Jonathan Somers (a cardiothoracic surgeon).

---

[2]  The claims against NLF Hospital and Northwestern Medicine Insurance Company were dismissed before trial. At trial, the Estate also dismissed, with prejudice, its claims against Northwestern Medical Faculty Foundation that were based on allegations that physicians other than Dr. Hodges were negligent. When the case went to the jury, it was solely on the Estate's claims against the Defendants based on Dr. Hodges's alleged negligence.

¶ 34      Many of the Estate's experts had prior personal or professional relationships with one or both of the Goldberg twins. The closest of these relationships was between Barry and Dr. Goldin, who was the surgeon who repaired Barry's 1996 thoracic aortic dissection. A few years after that surgery, Barry represented Dr. Goldin in an administrative dispute with a hospital. Their relationship also included professional consultations on the merits of various medical malpractice cases and personal interactions, such as invitations to family functions. Dr. Goldin acknowledged that he had worked with Barry and counsel for the Estate on this case since July 2017 and recommended multiple doctors who were ultimately retained by the Estate as experts, including Dr. Deutsch, Dr. Somers, and a radiologist who was deposed but not called to testify at trial. As for the Estate's other experts: Dr. Barkin had a relationship with Barry going back thirty years, considered him to be a friend, had worked with Goldberg & Goldberg on five or six cases, and was specifically recommended as an expert for this case by Barry; Dr. Kaufman had "done cases for" Goldberg & Goldberg (but also for the Defendants' attorney) and attended Barth's wake at the invitation of Ian Alexander, one of the firm's attorneys; and Dr. Somers had been represented by Barry in the same dispute as Dr. Goldin.

¶ 35      Four of the Estate's experts—Dr. Barkin, Dr. Goldin, Dr. Hall, and Dr. Kaufman—concluded that a thoracic aortic dissection was the cause of Barth's death. The defense experts were more circumspect, but none of them offered a contrary conclusion. Dr. Denton (a forensic pathologist) agreed that there was a dissection, but he testified that he was unable to conclude with a high enough degree of certainty that it was the cause of death without examining the heart and aorta, which were discarded after the autopsy. Dr. Gary Schaer (an interventional cardiologist) opined that the cause of death could have been the dissection, an arrythmia, or a heart attack, but he noted that the dissection might have itself caused a fatal arrythmia or heart attack.

¶ 36      There was, however, a clear difference of opinion about when the thoracic aortic dissection began. Three experts testified for the Estate that the dissection had already started by the time Barth fell at home the day before he died. Dr. Barkin opined that the dissection was the cause of the back pain that Barth had reported experiencing just before the fall. Dr. Goldin agreed,

noting that back pain and loss of consciousness when standing up were consistent with an aortic dissection. Likewise, Dr. Hall opined that the aortic dissection was the cause of both the pain and the fall. A fourth expert for the Estate, Dr. Kaufman, opined that the dissection would have happened "a day or two, at most," before Barth died. Due to the extent of the dissection, he thought it unlikely that it had unfolded over a matter of minutes just before Barth's death. The defense experts disagreed. Dr. Denton opined that the absence of inflammation in the affected areas meant that the dissection had only started within "about an hour or two" of Barth's death. Dr. Richard Freeman (a cardiothoracic surgeon) opined that, based on the sudden change to Barth's vitals at 7:46 p.m. and the absence of symptoms consistent with a thoracic aortic dissection before that, the dissection most likely occurred only minutes before his death.

¶ 37        There was also a dispute over whether Dr. Hodges should have suspected a thoracic aortic dissection. Dr. Barkin opined that Dr. Hodges's failure to diagnose a thoracic aortic dissection, or to at least include that condition in his differential diagnosis, fell below the standard of care. He also opined that, based on what was written in the hospital notes, Dr. Hodges "put blinders on" and focused solely on the fall itself to the exclusion of what might have caused it. He testified that Barth's presentation included several symptoms consistent with a thoracic aortic dissection: a possible loss of consciousness (at the time of his fall), altered mental status, upper back pain, neck pain, and unsteady gait. He acknowledged, however, that Barth was not experiencing chest pain, which is a common symptom of a thoracic aortic dissection, and that Barth's chest x-ray did not reveal any of several signs of a thoracic aortic dissection. The Defendants offered the contrary testimony of Dr. David Brown (an expert in emergency medicine), who opined that the Barth's "presentation was not suspicious for thoracic aortic dissection." He explained that thoracic aortic dissection is a rare condition to see in the emergency department and that it generally involves chest pain. Even if Dr. Hodges had included thoracic aortic dissection in an intentionally broad initial differential diagnosis, Dr. Brown testified, it would have "fall[en] off *** without any further evaluation."

¶ 38    In addition to the contested medical questions, there was also a factual dispute over whether Dr. Hodges took an adequate family history from Barth. Dr. Hodges's notes pertaining to Barth initially listed "negative" under family history. The day after Barth died, he changed the family-history entry to "unknown." At trial, Dr. Hodges testified that the possibility that a patient had suffered a heart attack, as he suspected Barth might have, would ordinarily prompt him to ask about whether there was a family history of cardiovascular problems. He further testified that he asked Barth about family history but that the "information wasn't provided," which is why he changed the notes from "negative," which was the default entry, to "unknown." The Estate elicited testimony, however, that Barth's father and brother had both died from heart problems. It later argued that Dr. Hodges had not, in fact, inquired into Barth's family history and that, had he, Barth or Angela would have informed him that Barry had undergone surgery for a thoracic aortic dissection.

¶ 39    2.  Barry's Health Records and Pretrial Privilege Assertion

¶ 40    As noted, the trial court denied the Estate's request to bar evidence or commentary about what transpired during pretrial discovery related to Barry's health history, including his assertion of privilege. That subject was first broached during opening statements, when the Defendants' counsel described Barry's thoracic aortic dissection as a "distraction" and commented on the limited information the Defendants had received about it:

> "Yes, I believe Barry Goldberg did have a thoracic aortic dissection based on some limited records that they have produced. They produced maybe two sentences of a redacted record for Barry Goldberg, and then they produced a few more records of Barry Goldberg.
>
> [ESTATE'S COUNSEL:] Objection, your Honor, the production by the plaintiff per the court.
>
> THE COURT: Sustained. Let's move it on."

¶ 41    The issue surfaced again during the Estate's direct examination of Dr. Goldin, who, in addition to offering his opinion as a cardiovascular surgeon about Barth's cause of death and the

course of Barth's treatment at NLF Hospital, had also performed the surgery to repair Barry's thoracic aortic dissection in 1996. When the Estate began asking him about that surgery, the Defendants objected based on their motion *in limine*. During the ensuing sidebar, the court noted that it would allow the Defendants to cross-examine Dr. Goldin about what transpired at his deposition:

> "As I said, you are now going to into an area that they're going to have wide latitude in their cross-examination and we're going to see what the doctor says. We're going to see what happened at the deposition. What was answered, what wasn't answered. Giddy-up. That's all I can say."

Dr. Goldin then briefly testified about the surgery itself, including that the blood was all fresh, liquid blood and that he did not see any evidence that the aorta had sustained an injury during the insertion of a stent one month earlier. He opined that Barry's thoracic aortic dissection "suggeste[ed] *** that there was a familial abnormality of fragile inner lying of the aorta which predisposed, therefore, both [Barth and Barry] to an aortic dissection."

¶ 42    On cross-examination, the Defendants' counsel asked a series of questions about Barry's medical records and his 1996 thoracic aortic dissection. Dr. Goldin testified that he only had "very limited records" about the thoracic aortic dissection and that Barry had asserted his physician-patient privilege at Dr. Goldin's deposition. At one point, counsel asked Dr. Goldin whether he knew that the Defendants had, "[a]t no point *** been allowed to see, to find, and look for the May 19, '96 operative note" that he had presumably written in connection with Barry's thoracic aortic dissection surgery. At another point, counsel asked whether Dr. Goldin knew that "Barry Goldberg has asserted his privilege *** and not allowed us to get Dr. Chhablani's records." The court overruled an objection to a question that contained an assertion that the Defendants had received "a tiny bit of record" from the thoracic aortic dissection surgery:

> "Q. So did you, as part of the production to be fair, plaintiff's counsel did provide us a tiny bit of record from May of 1996. Were you provided that?

[ESTATE'S COUNSEL]: Objection. I object. This was a Court ordered production through the Court itself.

THE COURT: Overruled.

* * *

A. I don't know what you are referring to."

Later, Dr. Goldin was asked whether it was hard to believe that the record of the 1996 operation was not available. The Estate did not object, and Dr. Goldin agreed that it was.

¶ 43    During redirect, the trial court sustained the Defendants' objection to a question designed to elicit that, during discovery, the court entered an agreed order that permitted Barry to waive his privilege as to information "having to do with the matters at issue in the lawsuit" while maintaining his privilege as to "unrelated" matters. It also sustained an objection to a question meant to elicit that Rush had produced all of its records on Barry directly to the court.

¶ 44    On recross, Defendants' counsel elicited that Barry asserted his privilege when Dr. Goldin was asked during his deposition whether Barry had a predisposing aneurysm that led to his 1996 dissection. The Estate did not object. He asked whether Dr. Goldin knew that Barry was still maintaining his privilege, which "prevents the defendants from getting any of his medical records" (Dr. Goldin did not understand the question), and whether Dr. Goldin knew that Barry's assertion of privilege meant that the Defendants could not issue subpoenas to any hospitals asking for his medical records (Dr. Goldin did not know). When counsel asserted that Barry's medical records had only been given to the court after being sent to Barry and the Estate, the court sustained an objection:

Q. The limited records, did you know, that we've gotten, that they issued the subpoenas, and they made sure that Barry Goldberg and those counsel got those records, and then they were given to the court—

[ESTATE'S COUNSEL]: I object. The Court—

THE COURT: Sustained. Sustained. The question's stricken. Disregard. Next question."

-14-

During the rest of recross, counsel continued referring to the absence of records surrounding Barry's thoracic aortic dissection.

¶ 45    During further redirect examination, the Estate's counsel asked whether Dr. Goldin had been told that "these records that we do have from Rush" were not produced or available until after he had been deposed. It appears from the record that, while asking this question, the Estate's counsel indicated a stack of paper that was several times thicker than the handful of pages that had been tendered to the Defendants after *in camera* review. Dr. Goldin did not answer the question because the court sustained the Defendants' objection to it, which was that "[t]here are more records that are displayed than we have been given in this case." The court also sustained an objection when the Estate's counsel asked Dr. Goldin whether he would have any reason to disagree with the proposition that the records were produced directly to a judge in the courthouse at some point after his deposition.

¶ 46    The only question on further recross asked whether Dr. Goldin was aware that, because Barry was still asserting his privilege, the Defendants had only received five pages of records. The Estate's objection, which was that the court had decided which records would be tendered to the Defendants, was sustained.

¶ 47    After the parties' examinations were complete, Defendants' counsel accused the Estate of engaging in gamesmanship by continuing to assert Barry's privilege, and it asked the court to instruct the jury that the defense was only given five pages of the Rush records. Counsel for the Estate responded that the jury should be instructed that it had tendered everything to the court, which then decided what needed to be disclosed to the Defendants, and argued that the suggestion that Barry was in control of what the court believed needed to be disclosed was false. Defendants' counsel countered that Barry was in control because the court was bound to respect his assertion of privilege. The court took no action:

> "THE COURT: It's going to keep getting very interesting. I can say that.
>
> I'm assuming at some point Barry's going to testify. We're going to keep
>
> seeing how things go, you know. We've got 12 people—17 who are

currently with us. I'm sure they have their own thoughts as we continue to move forward.

I don't know what to say. They're going to be the finders of fact. They're listening to these experts, you know. You know, everybody's holding up records. The jury doesn't see a bunch of them. I don't know what they're going to do with that. What can I say? All right.

Your comments are noted for the record."

¶ 48    After the next day's testimony ended, counsel for the Estate raised the issue again. He asserted that the Estate had "the right to show either by judicial notice or Barry Goldberg's testimony, one or the other, or some other form" to "point out what the truth is about what happened here." The court indicated that it would not "take judicial notice of one side's version of the truth," but it suggested that "Barry just get up and say I'm not blocking anything."

¶ 49    Barry, who was the last witness called by the Estate, took the stand the following week. On the day before his testimony, the Estate advised the court that it intended to offer the relevant discovery orders through Barry's testimony to counter the suggestion that Barry was the one who chose what would and would not be disclosed to the defense. The court remarked that it was "not inclined to give jurors a copy of an order." The parties circled back to the issue the next morning, and the court indicated it would not permit Barry to "get into transcripts" or "talk about court orders." The Estate argued, "We have to have some permissible way to get in front of the jury the truth as to what happened in the courtroom." The Estate also suggested, as an alternative, that the court "strike all discussion about this in its entirety and not have the jury decide what happened in court." In another discussion immediately prior to Barry's testimony, the court noted the minimal relevance of the dispute over privilege and production: "This isn't the issue of the case anyway. We're getting distracted and going into separate [*sic*] or third levels of trial issues that have no bearing on this case, in my humble opinion." The court ruled that it would not allow the transcripts of the pretrial hearings to be read, and it reiterated that it would not allow the Estate to question

Barry about court orders or transcripts. Beyond that, the court told counsel, "You can ask Barry what you think is appropriate. I will rule."

¶ 50    On direct examination, Barry testified in general about Barth's life, starting from childhood, and the kind of person he was. The subject then turned to the discovery issues surrounding his medical history. Barry testified that he did not, in any way, block the parties and counsel from obtaining records from Rush or St. Joseph concerning the issues in this case. Barry testified that he had not decided which of his records would be tendered to the Defendants, but it sustained objections to questions attempting to elicit that the court had been the one who determined which records were relevant and, for that reason, needed to be disclosed. Barry also testified that he had complied with discovery requests about the records and had made a limited waiver of his privilege. At this point, the Defendants' counsel asked for a sidebar, where he informed the court that, based on Barry's testimony, he intended to go into depth about what transpired during discovery:

> "I'm going to go through the discovery deposition with specific questions based on what they have done in this case. And I will go through the interrogatory answers because they said he signed interrogatories. So I just wanted everybody to know what just had happened. So we're going to show the jury the interrogatory answers. I'm going to take line by line of the depositions. I'm going to read counsel's objections. I'm going to read counsel's instruction not to answer the question. I'm going to see Barry Goldberg's next questions about he refuses to answer these questions. So I just—it is what it is. There's nothing I can do about it."

Before the sidebar ended, counsel for the Estate told the court that he wanted to elicit that Barry had initially asserted his privilege with respect to relevant discovery requests because he needed the Defendants' agreement to make a limited, as opposed to total, waiver of his privilege. The court indicated it understood but would not let him elicit that from Barry:

"[ESTATE'S COUNSEL]: I'd like to bring that out that that's why he did it.

THE COURT: We're not going to get into the reason why he might have did it.

\*\*\*

[ESTATE'S COUNSEL]: I'd like to bring out, did they agree to it?

THE COURT: He doesn't know, Counsel.

[ESTATE'S COUNSEL]: He sure does know because that was—

THE COURT: You're not asking him that. If you want to find another way, go ahead.

[ESTATE'S COUNSEL]: I'll do it another way.

THE COURT: Yeah, do what you want."

Barry then testified that, ultimately, he answered the interrogatories that he initially asserted his privilege in response to, that he signed the HIPAA order necessary to permit disclosure of his records from Rush and St. Joseph, that he had no control over what those hospitals turned over in response to the subpoenas, that neither he nor counsel for the Estate had redacted the records that were turned over to the Defendants, and that he continued trying to get records thereafter. He further testified that, following the disclosure of the records, the Defendants did not request additional discovery concerning his health history. He also explained why he asserted his privilege in the first place:

> "I don't think I would want or anybody would want certain things that
> may affect what the public may think their health condition is if it's not
> necessary. In this business it's a very cut throat business. And if people may
> think you have a problem medically, they may look at it and they may not
> send you business or they think there's something wrong with you. And I
> choose to, in fact, not have that only when it becomes necessary and
> relevant."

-18-

The Estate also asked Barry whether there had been any disagreement with the Defendants about the scope of his limited waiver of privilege or whether opposing counsel had expressly agreed to the limitations in writing, but the trial court sustained the Defendants' objections to those questions.

¶ 51     After a brief introductory exchange, Defendants' counsel started his cross-examination of Barry by remarking, "Okay. So I want to talk about something that this case is really about before I get into this whole privilege stuff ***." Counsel then asked a short series of questions about a telephone conversation Barry had with Barth about two hours before Barth died. Once those questions were answered, counsel said, "Now that I've got what this case is about, let me ask you a couple other things with you [*sic*] that wasn't covered with you so let me cover a couple other things with you, sir." Counsel then read verbatim from Barry's deposition transcript where he invoked his privilege, pausing only to elicit Barry's agreement that what was read had indeed taken place. Later, counsel elicited that Barry had not requested certain records from 2011 to 2015; Barry maintained, though, that he did not request them because the Defendants never asked him to. Counsel showed the jury the Estate's initial responses to interrogatories about Barry's thoracic aortic dissection, which asserted Barry's privilege.

¶ 52     On redirect examination, Barry testified that when he asserted his privilege at his deposition, he had done so on the advice of counsel. The court sustained objections to a series of questions meant to show that, when he asserted his privilege, he did so with the understanding that disclosing any privileged information might waive the privilege entirely and that the Defendants were able to seek a court order compelling him to answer any questions that he declined to answer on privilege grounds. The court also sustained objections to the Estate's attempts to elicit that he had stopped asserting his privilege as to relevant matters once the Defendants had agreed to a limited waiver. Barry did, however, testify that, after his deposition, the Defendants did not again make discovery requests asking him to disclose information that he had not disclosed at his deposition.

¶ 53                                            3. Verdict

¶ 54      The jury deliberated for less than a day before returning a verdict in favor of the Defendants.

¶ 55                                          II. ANALYSIS

¶ 56      On appeal, the Estate argues that it is entitled to a new trial because the trial court erroneously allowed the Defendants to elicit testimony about (1) Barry's allegedly obstructive conduct during pretrial discovery, (2) the Estate's decision to file suit before obtaining a section 2-622 report, and (3) the disposal of autopsy specimens by one of the Estate's pathologists. The Estate asserts that the only purpose of this evidence was to improperly suggest that Barry "was trying to win the case by intentionally hiding damaging evidence from the Defendants and the jury," and it contends that the evidence was irrelevant or that any probative value it had was substantially outweighed by the danger of unfair prejudice. See Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011) (relevance); Ill. R. Evid. 403 (eff. Jan. 1, 2011) (unfair prejudice).

¶ 57      Generally, whether to admit evidence is committed to the trial court's discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 33 (2003); see *Peach v. McGovern*, 2019 IL 123156, ¶ 25 (determining relevance under Rule 401); *McQueen v. Green*, 2022 IL 126666, ¶ 46 (determining whether to exclude based on unfair prejudice under Rule 403). We affirm evidentiary rulings unless they represent a clear abuse of that discretion. *Peach*, 2019 IL 123156, ¶ 25. Similarly, the trial court's rulings on the scope of argument by the attorneys are reviewed only for an abuse of discretion. *Simmons v. Garces*, 198 Ill. 2d 541, 571 (2002). This standard "is the most deferential standard of review—next to no review at all–and is therefore traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial." *In re D.T.*, 212 Ill. 2d 347, 356 (2004). A trial court abuses its discretion when its decision is arbitrary, fanciful, unreasonable, or based on a view that no reasonable person would take. *Haage v. Zavala*, 2021 IL 125918, ¶ 40. In other words, the decision must be "clearly against logic." *State Farm Fire & Casualty Co. v. Leverton*, 314 Ill. App. 3d 1080, 1083 (2000). We may find error only if the trial

court either "acted arbitrarily, without employing conscientious judgment," or "exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted." *Id.*

¶ 58                              A. Barry Goldberg's Assertion of Privilege

¶ 59      The Estate first contends that the trial court abused its discretion by allowing the Defendants to examine witnesses and elicit testimony showing, in essence, that Barry tried to obstruct the defense's efforts to investigate the circumstances surrounding the thoracic aortic dissection he suffered in 1996, including by invoking the physician-patient privilege, a statutory privilege that generally protects information acquired by a medical doctor while treating a patient. See 735 ILCS 5/8-802 (West 2022). Specifically, the Estate argues that the trial court erred when it denied its motion *in limine* to prohibit evidence or comment about Barry objecting to discovery of his medical records, Barry hiding his medical records, Barry asserting health-care privileges, or the court ruling on which of Barry's records could be discovered.

¶ 60      As discussed above, the parties engaged in lengthy and contentious pretrial litigation over records of Barry's 1996 thoracic aortic dissection that began with a dispute over Barry's assertion of the physician-patient privilege in the Estate's response to interrogatories seeking information about how and when the dissection was diagnosed and treated. During the course of that dispute, Barry agreed to a limited waiver of the privilege as to information pertaining to the treatment of his thoracic aortic dissection, and the Defendants ultimately obtained a handful of records following an *in camera* review by the judge assigned to the case for pretrial motions, who identified the "record[s] that reflected [Barry's] dissecting aortic aneurysm [*sic*]," which were then given to the Defendants. It does not appear that the motion judge ever directly ruled on whether Barry could assert his privilege. Before trial, the Estate sought to exclude evidence and commentary about Barry's assertion of privilege and about the discovery dispute generally. The trial court denied the Estate's motion *in limine*, and evidence on both topics was ultimately elicited at trial.

¶ 61     In their brief on appeal, the Defendants primarily argue that the trial court properly allowed evidence and argument about Barry's discovery conduct because Barry put his own health at issue in the Estate's complaint. This argument goes to whether Barry implicitly waived his privilege by, in his capacity as nominal plaintiff, putting his own health history at issue. See 735 ILCS 5/8-802(4) (codifying doctrine of waiver by implied consent); *Palm v. Holocker*, 2018 IL 123152, ¶¶ 20-33 (construing section 8-802(4)). But whether Barry's assertion of privilege was legally proper is distinct from whether it was admissible as evidence, and we are concerned with the latter question.

¶ 62     We first find that the fact that Barry had asserted his privilege was not admissible. The general rule is that no inference may properly be drawn from an assertion of privilege. Michael H. Graham, Graham's Handbook of Illinois Evidence § 508.1, at 446 (2023 ed.) ("Comment by the court or counsel with respect to a claim of privilege is ordinarily prohibited in order that the assertion of a privilege not be costly and that the policy reasons behind the privilege be given maximum effect. *** The underlying policy considerations support application of this prohibition to all privileges, no matter what their source.").[3] *A fortiori*, an assertion of privilege is inadmissible for the purpose of suggesting that adverse inference, which is the purpose for which the Defendants sought to elicit Barry's assertion of the physician-patient privilege. The trial court's decision to allow Barry's assertion of privilege to be introduced for that purpose was legally unsound and, therefore, an abuse of discretion. *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 80 (citing *Seymour v. Collins*, 2015 IL 118432, ¶ 50) ("A circuit court abuses its discretion if its ruling is based on an erroneous view of the law.").

¶ 63     Through a somewhat different path, we also conclude that the trial court abused its discretion by allowing the introduction of evidence about the discovery dispute generally. Evidence is not admissible unless it is relevant. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is

---

[3]     The only well-established exception to this rule is that, in a civil case, the trier of fact is permitted to draw an adverse inference from the assertion of the constitutional privilege against self-incrimination. See Graham's Handbook of Illinois Evidence § 508.1, at 446-47.

relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). And even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 64     As to relevance, the Defendants contend that Barry's discovery conduct was admissible to show "that they could not fully develop their theory that Barry Goldberg had suffered a catheter-caused [thoracic aortic dissection] because the Plaintiff objected and obstructed discovery of his past medical issues and history that was available to the plaintiff." We accept the basic premise that resisting discovery of potentially relevant information gives rise to an inference that the undisclosed information would be harmful to the party's case in some way, but we do not think that this principle applies to Barry's or the Estate's conduct during discovery here. The only potentially relevant information about Barry's medical history was information about his thoracic aortic dissection, and the record shows that, ultimately, Barry did not block discovery on that subject. Instead, he waived his privilege with respect to his thoracic aortic dissection, which allowed records to be subpoenaed and inspected *in camera* by the motion judge, who identified which records were relevant to Barry's thoracic aortic dissection and ordered their disclosure. Despite insinuating that Barry or the Estate was (and still is) hiding something, the Defendants' brief on appeal never explains what potentially relevant information remained out of their reach once Barry made his limited waiver of privilege.

¶ 65     But even assuming for the sake of analysis that Barry was still obstructing potentially relevant discovery, whatever relevance his discovery conduct might have is minimal. This case is about *Barth's* thoracic aortic dissection in 2015, not Barry's in 1996. The Estate asserts that Barry's thoracic aortic dissection is relevant only insofar as the fact that it occurred, which means it might have been disclosed had Dr. Hodges conducted a more searching inquiry into Barth's family history. According to the Estate, the cause of Barry's thoracic aortic dissection has no bearing on that issue. We do not necessarily agree. It is conceivable that, had Barry's thoracic aortic dissection

had been caused by a medical error, as the Defendants theorized, then (1) Barth would have been slightly less likely to disclose it as family history and (2) Barth would not be at a heightened familial risk of a thoracic aortic dissection. But these two theories of relevance are tenuous, at best, which means an adverse inference about the cause of Barry's dissection would have had minimal probative value.

¶ 66    At the same time, the Estate argues, and we agree, that disclosing Barry's discovery conduct to the jury created a significant danger of unfair prejudice. The adverse inference that naturally arises from blocking discovery of potentially relevant information is inherently prejudicial. There are situations where such inferences are fair. See *Midwest Trust Services, Inc. v. Catholic Health Partners Services*, 392 Ill. App. 3d 204, 209 (2009) (adverse inference from destruction or concealment of evidence); *cf.* Illinois Pattern Jury Instructions, Civil, No. 5.01 (2011) (adverse-inference instruction based on failure to produce evidence or witness). This is not one of them. There was no evidence that Barry or the Estate surreptitiously withheld his medical records. Instead, their supposedly obstructive conduct occurred openly within the ordinary discovery process itself, primarily through Barry's assertion, and subsequent partial waiver, of his physician-patient privilege. All parties to any civil litigation are entitled to take the discovery positions they reasonably believe are warranted by the circumstances with the expectation that unresolvable disputes will be submitted to the court before trial for a decision on a motion to compel. See Ill. S. Ct. R. 219(a) (eff. July 1, 2002). The Defendants twice sought to compel discovery related to Barry's medical history. The first request led to Barry's limited waiver; the second, which was made on the eve of trial, led to the production of the same five pages of medical records that the Defendants had already been given during pretrial discovery. If the Defendants believed that there was additional evidence to be found about Barry's thoracic aortic dissection, then they were entitled to request it through the ordinary discovery process. If they thought that Barry or the Estate had violated the discovery rules or the court's discovery orders, then they were entitled to seek an appropriate sanction. See Ill. S. Ct. R. 219(c) (eff. July 1, 2002). They were not entitled to insinuate to the jury that the Estate had hidden evidence. See *Skelkton v. Chicago Transit*

*Authority*, 214 Ill. App. 3d 554, 582 (1991) ("It has consistently been held that it is reversible error for counsel to create the inference that the opposing party had withheld evidence from the jury which would have been an important factor in its determination of the case."). Allowing the Defendants to bring their discovery grievances to the jury was extremely unfair to the Estate.

¶ 67    In a similar vein, we also find that allowing the Defendants to explore the details of a pretrial discovery dispute carried a substantial risk of confusing the issues and misleading the jury. The job of the jury was to decide the merits of the Estate's claim that Dr. Hodges's professional negligence proximately caused Barth's death. That task was already hard enough given the length of the trial, the sheer volume of medical testimony offered by more than a dozen expert witnesses, and the need to resolve the often-contradictory opinions of those experts. The parties' discovery dispute over Barry's medical records—again, not Barth's—was bound to distract the jury from its evaluation of the merits. At best, evidence and argument about that dispute would tear the jury's attention away from the ultimate issues at trial. At worst, it would mislead the jury into believing that Barry's and the Estate's supposedly obstructive conduct was one of those ultimate issues. It simply was not the jury's job to resolve the dispute.

¶ 68    In short, exposing the jury to the discovery dispute over Barry's medical records risked unfairly prejudicing the Estate, confusing the issues, and misleading the jury to such a degree that the only reasonable conclusion was that those dangers substantially outweighed whatever minor probative value that dispute had on deciding the ultimate merits of the Estate's case. See *Maffett v. Bliss*, 329 Ill. App. 3d 562, 574 (2002) ("[I]f a piece of evidence has slight probative value, any prejudicial effect on the jury may require exclusion."). The trial court, accordingly, abused its discretion when it denied the Estate's motion *in limine* to bar evidence and argument about the discovery dispute.

¶ 69    The next question is whether the that error requires reversal. "Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment or decree will not be disturbed." *Both v. Nelson*, 31 Ill. 2d 511, 514 (1964); *accord Simmons v. Garces*, 198 Ill. 2d 541, 566-67 (2002). "But where the case is a

close one on the facts, and the jury might have decided either way, any substantial error which might have tipped the scales in favor of the successful party calls for reversal." *Id.* at 514. As the party seeking reversal, the Estate bears the burden of showing that the trial court's rulings were prejudicial. *Browning v. Advocate Health & Hospital Corp.*, 2023 IL App (1st) 221430, ¶ 49. "To show prejudice, 'there must be a reasonable basis supporting the conclusion that, but for the error, the verdict might have been different.' " *Martin v. City of Chicago*, 2023 IL App (1st) 221116, ¶ 37 (quoting *Doe v. University of Chicago Medical Center*, 2014 IL App (1st) 121593, ¶ 87).

¶ 70 Our review of the record discloses that the case was close enough on the facts "such that the jury might have decided either way." *Both*, 31 Ill. 2d at 515. "In [a] wrongful death action, as in any negligence action, it [is] plaintiff's burden to prove three essential elements: (1) that defendants owed a duty; (2) that defendants breached the duty they owed; and (3) that the breach proximately caused the injury." *Stanphill v. Ortberg*, 2018 IL 122974, ¶ 33. In medical-malpractice actions, the relevant duty is to "use *** the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances." *Advincula v. United Blood Services*, 176 Ill. 2d 1, 23 (1996). The two key issues at trial were whether Dr. Hodges deviated from that standard of care by failing to suspect that Barth was experiencing a thoracic aortic dissection and, if so, whether that failure proximately caused Barth's death by missing the opportunity to surgically repair the dissection before it became fatal. Multiple experts in a variety of medical disciplines testified in favor of each side on those subjects, and there was also a significant factual dispute over whether Dr. Hodges had inquired into Barth's family history. The battle of the experts had no clear winner, and that key question of historical fact lacked an obvious answer. In short, "[t]his was a close case involving dueling expert testimony." *Ricks v. Advocate Health & Hospitals Corp.*, 2021 IL App (1st) 200952-U, ¶ 52.

¶ 71 The question becomes whether the erroneous evidence and argument thereon could have changed the jury's verdict. We think it could. As we have already explained, the evidence about Barry's assertion of his privilege and the ensuing discovery dispute was inherently prejudicial because it tended to suggest that the Estate had concealed evidence and, in general, engaged in

unethical or underhanded tactics. Those suggestions would have naturally tainted the jury's evaluation of each side's evidence. As the plaintiff, the Estate had the burden of proving its case by a preponderance of the evidence, that each element of its claim was more likely true than not true. In other words, based on the evidence it had heard, the jury had to estimate probabilities: How likely was it that Barth was killed by a thoracic aortic dissection? How likely was it that the thoracic aortic dissection occurred early enough for Dr. Hodges to catch it? How likely was it that, had it been detected by Dr. Hodges, Barth would have survived? The possibility that the Estate was concealing important evidence would have factored into the jury's evaluation of those questions. Especially if the jury thought that the case was close, its consideration of that improper inference might have proven decisive when it decided where the final balance of probabilities lay.

¶ 72    The Defendants argue that exposing the jury to the privilege dispute was, at worst, a minor impropriety in view of the length of the trial in this matter. The record shows otherwise. Barry's assertion of privilege and the associated discovery disputes were a significant topic of Dr. Goldin's testimony. And when Barry himself testified, the issue took center stage. Based on the trial court's ruling, the Estate fronted the fact that Barry had invoked his health-information privileges before making a limited waiver. Over the course of Barry's direct, cross, redirect, and recross examinations, he then testified in detail about the pretrial litigation over his—not Barth's— medical records. Interrogatories and the Estate's responses thereto, including Barry's privilege assertion, were read verbatim. So were excerpts from Barry's deposition transcript. Other topics covered during his testimony included the reasons he invoked the privilege, his attorney's advice about asserting privilege, the reasons he agreed to a limited waiver, his understanding of hospital record-keeping practices, the subpoenas issued to certain hospitals, the reasons why additional subpoenas were not issued, and who was responsible for redacting the records that were ultimately turned over to the Defendants following an *in camera* review.

¶ 73    That was not the end of it. During closing argument, counsel for the Defendants once again raised the topic, suggesting that the Estate was hiding something important about Barry's aortal dissection:

"The subpoenas were sent from '95 to '98 only. Limited subpoena to Rush as a thing. You didn't see any subpoenas being issued to—we heard on this case from Dr. Goldin, you know, it was an ophthalmologist office, an ophthalmologist said he had a dissection. Didn't see any records from that. How do you challenge that? How do you question that? Didn't have them. Didn't get any records.

Then we've heard it was at St. Joseph's Hospital. Didn't see any records for that. Then [counsel for the Estate] questions Dr. Schaer about some doctor by the name of Dr. Martin Leon. Never heard of that. So it took place in Washington D.C., when he was in Washington D.C., Barry Goldberg's dissection. Ladies and gentlemen, use your common sense. Did we get any records from Barry Goldberg about his dissection taking place other than the redacted records from Dr. Chhablani, some insurance records, and some small records that we got from a time period about this, but if we can get 736 records from 2010 until 2015 for Barth Goldberg when he was being cared for by the same cardiologist and the same group, do you think you are not going to get records from 2010 to 2015 for Barry Goldberg if you sent a subpoena? They've never sent that subpoena. Defendants have been prohibited from sending a subpoena for specific time period only in this case. They're—what's to hide? We've heard about there's privacy laws. I agree with all of those things, but if you are going to make a claim that there is a family history that puts somebody at risk, you better get us the records for the family history that supports that contention. And you better give us how did it took place, where did it take place, when did it take place, what was the repair, what other ancillary records in this case. If that was truly the case, why not—why all these roadblocks in this case. Use your common sense on that position."

This argument focused the jury's attention on the discovery dispute and urged the jury to draw an adverse inference from Barry's assertion of privilege and the Defendants' dissatisfaction with what they were able to discover about Barry's medical history. The Defendants' own conduct in the trial court belies their suggestion on appeal that any error was *de minimis*.

¶ 74    We also note that the trial court deprived the Estate a full opportunity to respond to the improper suggestion that it was concealing evidence. During Barry's redirect examination, the court repeatedly sustained the Defendants' objections to questions meant to explain the broader legal context in which Barry decided to assert his privilege during his deposition, including the fact that the Defendants were free to seek a court order compelling him to answer a particular question and his concern that he might waive the privilege altogether if he answered any questions about his health history, even questions he was willing to answer. We understand, of course, that it would ordinarily not be appropriate to delve into these topics at trial, but that was the door the trial court opened when it allowed the Defendants to put a pretrial discovery dispute in front of the jury. By not allowing the Estate to place its discovery positions in context, the trial court foreclosed an opportunity to diminish the prejudicial effect of its error.

¶ 75    Between the closeness of the case, the prominence of the issue during the testimony of two important witnesses for the Estate, and the Defendants' all-but-explicit argument that the Estate was hiding something, we cannot say that improperly exposing the jury to evidence about the parties' pretrial discovery dispute could not have had an impact on the verdict. The trial court reversibly erred when it denied the Estate's motion to bar evidence and commentary about Barry's assertion of the privilege and the associated discovery dispute. It is unfortunate that the outcome of a trial that consumed so much time and energy from the court, the parties, the lawyers, and the 17 citizens who served as jurors (including alternates) must be reversed. But the Estate deserves to have its case decided on its merits, not on innuendo and speculation about its motives during pretrial discovery. We reverse and remand for a new trial.

¶ 76                    B.  The Estate's Other Claims of Error

¶ 77    Because we are reversing and remanding for a new trial, we find it prudent to address the Estate's other two claims of error, which involve evidentiary issues that are likely to recur at a new trial.

¶ 78                        1.  Litigation Timeline

¶ 79    The Estate argues that the trial court abused its discretion when it permitted the Defendants to elicit evidence showing that the complaint in this case was filed before the Estate consulted any physicians.

¶ 80    Normally, a medical-malpractice complaint must be supported by an affidavit showing that a health professional has reviewed the relevant materials and concluded, in a written report, "that there is a reasonable and meritorious cause for" bringing the claim. 735 ILCS 5/2-622(a)(1) (West 2016). Because obtaining such a report takes time, however, the statute also authorizes the plaintiff to file what amounts to a protective suit to preserve his or her rights if the statute of limitations is set to expire before a report can be obtained. *Id.* § 2-622(a)(2). That protective suit must be supported by an affidavit asserting that the "consultation required could not be obtained before the expiration of the statute of limitations." *Id.* The plaintiff then has 90 days to obtain such a report and submit an affidavit under section 2-622(a)(1), and the defendant's obligation to answer or otherwise plead in response arises only after the section 2-622(a)(1) affidavit is filed. *Id.*

¶ 81    The record shows that the Estate filed its complaint on April 25, 2017, two days before the limitations period would have expired. See *id.* § 13-212(a). Rather than supporting the complaint with a "reasonable and meritorious cause" affidavit under subsection (a)(1), the Estate filed a protective suit under subsection (a)(2), preserving its rights until it was able to obtain the necessary consultation in September 2017,[4] about two weeks before the October 3 exhumation and autopsy.

---

[4]    The deadline was extended past the initial 90 days by agreement.

¶ 82　　　There is no dispute that the Estate had a legal right to file a protective suit before obtaining the consultation and report required by section 2-622(a)(1). The question is whether the Defendants could properly elicit that the complaint was filed before the Estate consulted with its experts. The Estate argues that the relationship between the complaint being filed and the experts being consulted was irrelevant because it had no bearing on the issues at trial. It also argues that the evidence about the timing of the complaint was unfairly prejudicial because it gave rise to an inference that the Estate improperly manufactured evidence to support its claims.

¶ 83　　　On appeal, the Defendants contend that introducing the "chronology of events," including the timing of the complaint's filing and expert consultations, "allowed the Defendants to test the bias and credibility of many of the Plaintiff's experts, who were friends and clients of the Plaintiff and Barth." Although their appellate brief fails to elaborate, the transcript of the pretrial hearing on the parties' motions *in limine* reveals that the Defendants wanted to lay out for the jury the involvement of Dr. Goldin in the case, both before and after the complaint was filed:

> "[DEFENDANTS' COUNSEL]: Well, it's an interesting order of events, your Honor. ***
>
> But Dr. Goldin had been consulted, according to the records we have from his expert rider, before the complaint was filed, he had already been a part of a consultant in this case, and then the complaint was filed without a 622 report, which was then filed, and then I believe the exhumation and autopsy occurred, and then there was an amended 622 filed. So there's a whole chronology of events, which is going to be the defense in this case. So I assume that we can talk about that chronology, but without getting into the timing and filing of Dr. Goldin or anything along those lines."

This is a reasonable theory of relevance. The chronology showed that Dr. Goldin had an unusual degree of involvement with the Estate and this litigation that stretched back to before the complaint was filed. That involvement, in turn, tended to demonstrate a personal bias in favor of the Estate and its claims, which naturally went to the credibility of his expert opinion. See *Moore v. Mandell*,

2023 IL App (5th) 220289, ¶ 35 (stating that parties must be given wide latitude to demonstrate an expert witness's bias). The relative timing of the complaint and various expert consultations—including with experts specifically recommended by Dr. Goldin—was a fact that would be shown incidentally while eliciting Dr. Goldin's involvement. We cannot say that it was an abuse of discretion to allow the Defendants to elicit that fact for that purpose, so we find no error in denying the motion *in limine*.

¶ 84    The Estate also argues, however, that the Defendants took advantage of the ruling on the motion *in limine* by using this evidence not to show Dr. Goldin's relationship with the Estate but to suggest that the Estate filed suit and then manufactured evidence to support its chosen theory. The Estate's brief identifies four instances where the subject was brought to the jury's attention.

¶ 85    First, during opening statements, counsel for the Defendants explained to the jury the circumstances leading to the exhumation and autopsy:

> "About two years, less than a little [*sic*] two years, a complaint is filed. No autopsy and the cause of death is thoracic aortic dissection. Plaintiff retains a pathologist, Dr. Kaufman. Plaintiff goes and meets with Dr. Goldin, their friend. Dr. Goldin then suggests let's go and meet—and get a radiologist, and I recommend Dr. Hibbelin, another one of their experts who is at Rush.
>
> Dr. Hibbelin looks and meets with them and decides, all of them decide there must be a thoracic aortic dissection, and they also then say let's just do a radiology study, let's get a radiologist and we will file a case and proceed with this."

The Estate noted its objection based "on the limine hearing on this subject matter," and the court overruled it. We do not find an abuse of discretion. Opening statements are for the attorney to set out what they expect the evidence to show. *In re Commitment of Lingle*, 2018 IL App (4th) 170404, ¶ 53. These facts are part and parcel of the evidence that the Defendants anticipated eliciting to show Dr. Goldin's bias, as described at the motions hearing. It did not expressly suggest that the Estate acted improperly by consulting with experts after filing suit. When the Estate raised

the matter immediately after opening statements, the trial court noted that Defendants' counsel had "soft pedaled" the argument, which contained nothing "offensive" or "extremely prejudicial." We defer to that assessment. See *Simmons*, 198 Ill. 2d at 568 ("Questions as to the prejudicial effect of remarks made during opening statement and closing argument are within the discretion of the trial court, and determinations as to such questions will not be overturned absent a clear abuse of discretion.").

¶ 86    Second, while cross-examining Dr. Goldin, the Defendants elicited that he knew a lawsuit had already been filed before meeting with the Estate's representatives on July 6, 2017, and the Estate once again objected "based on the limine hearings." It is clear in context that Defendants' counsel elicited that fact not for its own sake but to challenge Dr. Goldin's claim that he had no involvement in the decision to exhume Barth's body for an autopsy:

"Q.  So this exhumation autopsy that was done two and a half years later was done for one purpose and it's for this lawsuit, isn't that true, sir?

A.  I was not part of that decision process, so that was not within my area of knowledge or discussion.

Q.  But, sir, you met with them on July 6 of 2017, right, sir?

A.  Right.

Q.  Did you know a lawsuit had already been filed before that?

A.  I believe that I was aware that a lawsuit had been filed because of statute of limitations, yes.

Q.  And then [Estate's counsel] asked you yet [*sic*]—

[ESTATE'S COUNSEL]: May I just note for the record objection [*sic*] based on the limine hearings.

THE COURT: Noted.

BY [DEFENDANTS' COUNSEL]:

Q. But you did tell [Estate's counsel] yesterday that you all consulted and based on that consultation is when this exhumation that took place, right, sir?

A. I don't understand the context of your question.

Q. Well, I am just understanding your testimony yesterday. Mr. Davidson yesterday told us that you met with him, you had been tremendous help to them, and you met and after discussions with you, then there's an exhumation autopsy was done. Do you remember that from yesterday?

A. Yes, I do."

The point of the question was to emphasize Dr. Goldin's involvement in the litigation, not to suggest that the Estate had engaged in some kind of chicanery by consulting with him after filing suit. The trial court did not abuse its discretion by overruling the objection.

¶ 87        Third, during the cross-examination of Dr. Kaufman (the Estate's pathologist), the Defendants' counsel asked whether he knew that the complaint was filed on April 21, 2017. The Estate's objection was overruled:

"[ESTATE'S COUNSEL]: Objection, in limine, it is totally irrelevant in respect to the—

THE COURT: We talked about this issue. It's overruled.

[ESTATE'S COUNSEL]: All right."

Following the court's ruling, the Defendants' elicited that Dr. Kauffman did not know when the complaint was filed; did not know that it had already been filed when he was initially retained by the Estate on April 27, 2017; knew that the question his expertise was required on was whether a thoracic aortic dissection had been missed; and told the Estate's representatives that an autopsy would be necessary to make that determination. Unlike the two previous overruled objections, this testimony had nothing to do with Dr. Goldin's unusually close relationship with the Estate. Dr. Kaufman testified without contradiction that he did not know Dr. Goldin, and there was no evidence that Dr. Kaufman was hired at Dr. Goldin's recommendation. The only evident purpose

of this testimony was to suggest the improper inference that the Estate filed suit and then tried to manufacture evidence to support its claims. The trial court should have sustained the objection.

¶ 88    Fourth, during closing argument, the Defendants' counsel emphasized that three of the Estate's experts were only retained after it had filed suit:

> "Family wishes were accepted. No autopsy was done in the case. April 27—just before they're allowed to do this, within two years of statute of limitations, the lawsuit was filed.
>
> Dr. Marshall Goldin, who happens to be today—he's been a tremendous resource. Of course he's been a tremendous resource and a friend of this case, and he began working with them. Dr. Kaufman began working with them. Dr. Hibbelin began working with them. And an exhumation was done for one purpose and one purpose alone, for this lawsuit."

To the extent this argument again emphasized Dr. Goldin's close connection with the Estate, we do not perceive any error. To the extent that this argument improperly suggested that the Estate had somehow done something wrong by filing its protective suit before going through the logistics of having an exhumation and autopsy performed, it may well have been objectionable. But the Estate forfeited any objection by not raising it at trial. *Dynek v. City of Chicago*, 2020 IL App (1st) 190209, ¶ 57.

¶ 89    In summary, it was not an abuse of discretion for the trial court to allow the Defendants' to elicit evidence showing when the complaint was filed for the purpose of showing the extent to which Dr. Goldin worked with the Estate on this case. We caution, however, that allowing the Defendants to show that the complaint was filed before other experts were retained created a risk that the jury would improperly and prejudicially infer that the Estate had engaged in some kind of wrongdoing. At any retrial, the court should take care to minimize that risk and to ensure that this evidence is not used for an improper purpose.

¶ 90                          2. Autopsy Specimens

¶ 91        The Estate's final claim of error is that the trial court improperly allowed the Defendants to elicit testimony that one of its pathologists discarded heart specimens that were collected at the autopsy for the purpose of creating slides. It argues that court erred when it denied its motion *in limine* to bar Dr. Denton from testifying that "plaintiff's [*sic*] attorneys generally maintain pathology slides or are in any way responsible for maintaining pathology slides."[5] It also contends that the court erroneously overruled its objections to questions posed to Dr. Goldin and Dr. Kaufman on cross-examination about specimens collected at the autopsy being discarded. As with the dispute over Barry's medical records, the Estate contends that this matter improperly put a discovery dispute before the jury.

¶ 92        The trial court did not err by denying the motion *in limine*. The record shows that Dr. Denton never testified that the attorneys for the plaintiff were responsible for maintaining pathology specimens. Instead, he testified that the protective order governing the exhumation and autopsy in this case specified that *Dr. Kaufman* was obligated to retain and preserve autopsy specimens. That testimony, moreover, was properly admissible. Dr. Denton testified that his ability to reach a definitive conclusion about the cause of death was limited by the fact that he did not personally examine Barth's heart or aorta after the autopsy. The reason for that limitation—which was that the heart and the aorta were unexpectedly discarded by the Estate's other pathologist, not that he had not bothered to examine them—was relevant to the credibility of his expert opinion, especially given that, after issuing his original report without opining on the cause of death, he had been required to submit an addendum offering his opinion on that subject. Furthermore, we are not persuaded that there was a significant risk that allowing Dr. Denton to explain that limitation would result in unfair prejudice to the Estate. We note that any unfair prejudice that might arise from

---

[5] During the hearing on the motions *in limine*, the court reserved a ruling on this issue at the request of the Defendants so counsel for the Estate could point out where Dr. Denton had said that attorneys for plaintiffs were usually responsible for maintaining pathological specimens. The record shows that the motion was ultimately denied, although it is not clear when or why.

suggesting that the plaintiff's experts were trying to destroy evidence was mitigated by Dr. Kaufman's testimony that he believed that the only purpose for retaining specimens after the autopsy was for making slides, which was done, and his testimony that Dr. Denton "knew what we were doing." We also note that the court declined to instruct the jury that it could draw an adverse inference from the fact that one of the Estate's experts discarded the heart and the aorta. On balance, it was not unreasonable to think, as the trial court evidently did, that the probative value of Dr. Denton's explanation was not substantially outweighed by any danger of unfair prejudice. The court did not abuse its discretion by denying the motion *in limine*.

¶ 93                              CONCLUSION

¶ 94      The trial court reversibly erred by allowing evidence and argument about Barry Goldberg's assertion of the physician-patient privilege and the pretrial discovery dispute over his health history. The judgment is reversed, and the cause is remanded for a new trial.

¶ 95      Reversed and remanded.